UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION
-----------------------------------------------------X
EVE WEXLER

              Plaintiff,

v.

KENNESAW PEDIATRICS, P.C.

              Defendant
-----------------------------------------------------X

Case No.:_____

**JURY TRIAL DEMANDED**

## COMPLAINT

COMES NOW Plaintiff Dr. Eve Wexler and shows the Court the following for her

Complaint against Defendant Kennesaw Pediatrics, PC:

## PARTIES

1.     Plaintiff Eve Wexler ("Dr. Wexler") is a citizen of the United States and she

resides in Dekalb County, Georgia.

2.     Dr. Wexler is a female.

3.     Defendant Kennesaw Pediatrics, P.C. is a corporation having its principal

place of business in Kennesaw, Cobb County, Georgia. Kennesaw Pediatrics, P.C.

has more than 15 employees.

4.      Kennesaw Pediatrics, P.C. registered agent is Mark A. Long, MD at 3745

Cherokee Street #401, Kennesaw, GA 30144

## JURISDICTION AND VENUE

5.      This Honorable Court possesses subject matter jurisdiction over this civil

action because it arises under the laws of the United States. 28 U.S.C. § 1331; 42

U.S.C. § 2000e *et seq*.

6.      Venue is proper in the Atlanta Division of the United States District Court

for the Northern District of Georgia because a substantial part of the events and

omissions giving rise to the claims in this action occurred in Cobb County, Georgia

which is in the Atlanta Division of the Northern District of Georgia.

## FACTS

7.      Plaintiff was hired by Kennesaw Pediatrics in approximately November

2013.

8.      Plaintiff entered into a written employment agreement in approximately

November 2013.

9.      Plaintiff was fired by Kennesaw Pediatrics on approximately May 15, 2014 because Dr. Mark Long, the owner of Kennesaw Pediatrics, P.C., discriminated against Plaintiff for pumping breast milk at work for her son who was under the age of 1.

10.     Plaintiff encountered difficult experiences while working for Kennesaw Pediatrics, P.C. in obtaining adequate time and a suitable location to pump enough breast milk for her son.

11.     Dr. Long made comments about Plaintiff's breast pumping which made Plaintiff feel uncomfortable.

12.     Dr. Long initially claimed to Plaintiff that she was fired because she tried to solicit other doctors to leave his medical practice.

13.     Approximately a year later, in retaliation for Plaintiff filing an EEOC claim, Defendant added that Plaintiff lied about her solicitation activities.

14.     Plaintiff did not solicit or ask any employee of Kennesaw Pediatrics, P.C. to leave their employment.

15.     Plaintiff did not solicit or ask any employee of Kennesaw Pediatrics, PC to work for her.

16.     Plaintiff did not ask any employee of Kennesaw Pediatrics to work for any other medical practice.

17.    Plaintiff did not ask any employee of Kennesaw Pediatrics to work for any other entity.

18.    Plaintiff was under severe financial pressure at the time that Kennesaw Pediatrics alleges that she solicited employees at Kennesaw Pediatrics and was in no position to open a new practice.

19.    Plaintiff did not lie to Dr. Long or to anyone else about her alleged solicitation activities.

20.    Plaintiff was not provided adequate time to pump breast milk while working at Kennesaw Pediatrics, P.C.

21.    Plaintiff was given short breaks which did not allow her enough time to pump enough breast milk to reduce the discomfort of carrying too much milk.

22.    The break periods for pumping breast milk were far apart so that it resulted in pain to Plaintiff from carrying too much milk.

23.    At the start of Plaintiff's employment, she was only allowed to pump breast milk in one of the bathrooms at the medical practice.

24.    When Plaintiff told Dr. Long about this, she was told by him that because she was a salaried employee he didn't have to give her breast pumping breaks.

25.    Dr. Long then implied that he was doing Plaintiff a favor by accommodating her breast pumping schedule and that she should be grateful for this accommodation.

26.     Shortly thereafter, Dr. Long did allow Plaintiff to start pumping breast milk in an office during her breaks rather than in the restroom, although this accommodation was given with exasperation.

27.     Dr. Long continuously chastised and harassed Plaintiff about her breast pumping schedule and stated that it was making her productivity too low and that it would affect her bonus even though Plaintiff was not eligible for a bonus under the contract.

28.     Dr. Long also stated that he was being a "nice guy" because the nurses at the medical practice liked Plaintiff and he could find a way to schedule Plaintiff to allow her "breasts to refill."

29.     Plaintiff found these interactions with Dr. Long regarding her breast pumping to be uncomfortable and hostile.

30.     Dr. Long was aware that he was acting in a hostile manner towards Plaintiff and making her extremely uncomfortable.

31.     Dr. Long was aware that he was degrading Plaintiff as a new mother and as a woman.

32.     During a lunch in early May with Dr. Long, Plaintiff stated to Dr. Long that she was going to done pumping breast milk for her first son shortly.

33.    Plaintiff thought this news would be greeted positively by Dr. Long because of his history of appearing irritated, frustrated, and uncomfortable with her breast pumping.

34.    Instead, Dr. Long appeared to be more irritated, frustrated, and uncomfortable with the news.

35.    Dr. Long stated that he thought that Plaintiff was "supposed to be done by May!"

36.    Plaintiff tried to explain that her son was not quite 1 years old yet, and that while she would continue to breast feed him, she would stop pumping at work when he turned 1.

37.    When Dr. Long left this lunch meeting, he appeared to be both irritated and frustrated with Plaintiff.

38.    Dr. Long knew of Plaintiff's desire to have more children.

39.    Plaintiff was fired approximately one week after this lunch discussion.

40.    Dr. Axelrod was an employee of Defendant.

41.    Dr. Seth was an employee of Defendant.

42.    Plaintiff was approached by Dr. Maria Axelrod about the idea of opening a new medical practice in the future.

43.    Plaintiff did not approach Dr. Axelrod about opening a medical practice.

44.   Plaintiff's discussions about opening a medical practice in the future were theoretical.

45.   Plaintiff had no specific plans to open a medical practice.

46.   Plaintiff had no general plans to open a medical practice.

47.   Plaintiff had no plans to open a medical practice.

48.   Plaintiff never asked Dr. Axelrod to stop working for Kennesaw Pediatrics, P.C.

49.   Dr. Axelrod and Plaintiff never took their discussions further than a hypothetical discussion.

50.   No new company was formed by Plaintiff or on her behalf to be the basis of a new medical practice.

51.   No medical practice office locations were scouted or viewed by anyone for the purposes of opening a new medical practice.

52.   Plaintiff was excited about forming bonds with colleagues Dr. Axelrod and Dr. Seth and viewed these discussions about the dream of one day opening a medical practice as a way to form those bonds.

53.   Dr. Axelrod asked Plaintiff to approach Dr. Seth about discussing opening a medical practice together.

54.   Dr. Axelrod suggested that Plaintiff ask Dr. Seth to a dinner.

55.   The idea of the dinner was not Plaintiff's idea but was Dr. Axelrod's idea.

56.    Plaintiff approached Dr. Seth about having dinner with Dr. Axelrod and herself in order to talk about work and Dr. Axelrod's idea of opening a medical practice together in the future.

57.    Plaintiff never asked Dr. Seth to quit her job at Kennesaw Pediatrics, P.C., to come work for Plaintiff or any other medical practice.

58.    Plaintiff never asked Dr. Axelrod to quit her job at Kennesaw Pediatrics, P.C., to come work for her or any other medical practice.

59.    Plaintiff never asked Dr. Axelrod to leave her employment with Plaintiff.

60.    Plaintiff never asked Dr. Seth to leave her employment with Plaintiff.

61.    The planned dinner never occurred.

62.    No further discussions regarding a new medical practice were held.

63.    Dr. Long knew or should have known of the true nature of these discussions.

64.    Dr. Long called Plaintiff on the phone to fire her.

65.    The phone call lasted approximately one minute.

66.    During the phone call, Dr. Long yelled at Plaintiff the entire time.

67.    Plaintiff was not given an opportunity to respond to Dr. Long's allegations that Plaintiff was trying to steal his employees and open a new practice during this phone call.

68.    Plaintiff was not given a chance to speak and therefore could not have lied about conversations she had with Dr. Axelrod or Dr. Seth.

69.     Plaintiff would not have lied about conversations she had with Dr. Axelrod or Dr. Seth had she been given the opportunity to speak.

70.     Each time Plaintiff tried to speak, Dr. Long began yelling and speaking over her.

71.     Dr. Long told Plaintiff that she was fired during this phone call.

72.     Plaintiff was never given any written notice of termination.

73.     Dr. Long told Plaintiff that she was fired immediately.

74.     Plaintiff was not given 60 days to continue to work after being terminated.

75.     The contract requires that Plaintiff be given 60 days notice prior to her termination if she is fired without cause.

76.     Plaintiff was not given written notice of the basis for her firing.

77.     Plaintiff was fired without cause.

78.     Plaintiff did not violate the solicitation clause.

79.     Dr. Long did not believe that Plaintiff violated the solicitation clause.

80.     Both Dr. Axelrod and Dr. Seth remained employed by Defendant after Plaintiff was fired.

81.     If Dr. Wexler violated the solicitation clause, Dr. Axelrod who initiated the discussions certainly violated the solicitation clause.

82.     Dr. Long fired Plaintiff who was pumping breast milk.

83.    Dr. Long fired Plaintiff who intended to pump breast milk for her potential future children.

84.    Dr. Long knew Plaintiff intended to have future children. Indeed, an AFLAC representative came to the office with Dr. Long's consent and signed up Plaintiff for a plan which would compensate her while she is on maternity leave.

85.    Dr. Long fired Plaintiff roughly one week after he was visibly irritated and frustrated to learn the Plaintiff was still pumping breast milk.

86.    Upon information and belief, Dr. Long allowed Dr. Axelrod and Dr. Seth to explain their conversations with Plaintiff, but did not allow Plaintiff the doctor who he had an issue with over pumping breast milk, to explain her conversations with Dr. Axelrod or Dr. Seth.

87.    In furtherance of Kennesaw Pediatrics, PC's discrimination against Plaintiff, after Dr. Wexler was terminated, Kennesaw Pediatrics, PC initiated a baseless lawsuit against Dr. Wexler seeking damages from Dr. Wexler in the Superior Court of Dekalb County. That lawsuit is ongoing.

88.    Notably, the baseless lawsuit does not seek any relief from the Court in the nature of causing Plaintiff to cease her alleged "solicitation activities" rather Plaintiff merely seeks damages for a breach of contract.

89.    That Defendant claims in the baseless lawsuit that Plaintiff was fired because of solicitation of Defendant's employee and not even seeking to prevent

Plaintiff from further solicitation activities shows that Defendant did not believe that Plaintiff engaged in solicitation activities and/or that Defendant did not care about Plaintiff's solicitation activities but for the fact that she was pumping breast milk.

90.     The baseless lawsuit claims that Plaintiff was fired because of solicitation activities and by inference not because of lying.

91.     Indeed, a proposed separation agreement by Dr. Long shortly after Plaintiff was fired states that she was fired due to solicitation. It says nothing about lying. **See Exhibit A**.

92.     After Plaintiff filed her EEOC complaint against Kennesaw Pediatrics, PC for discriminating against her on the basis of her sex, Defendant amended its state court complaint to accuse Plaintiff of lying as well.

93.     An affidavit of Dr. Long dated January 28, 2016 states that Plaintiff's solicitation activities bothered him less than her lying about her solicitation activities.

94.     As stated above, Plaintiff was not told that she had lied to Dr. Long until after the EEOC complaint was filed.

95.     In a blatantly obvious attempt to explain claims against him for discrimination, including the fact that he fired Plaintiff and not Dr. Axelrod even though Dr. Axelrod raised the idea and she suggested that they ask Dr. Seth to join in a dinner conversation Dr. Long claimed that it was Plaintiff's lying that bothered him more than Dr. Wexler's solicitation activities and that Dr. Axelrod did not lie to Defendant.

96.     Dr. Wexler did not lie to Defendant nor did Defendant believe that Dr. Wexler had lied to it.

97.     Upon information and belief, Plaintiff was replaced with a doctor who was not lactating.

98.     Plaintiff was qualified for her job being a board certified licensed physician in pediatrics at the time she was fired and she had gotten positive reviews from Dr. Long..

99.     On October 24, 2014, Dr. Wexler timely filed a charge with the U.S. Equal Employment Opportunity Commission (the "Commission") alleging that the Defendant engaged in an employment practice made unlawful by Title VII by discharging Plaintiff because of her sex.

100.   On May 2, 2016, Plaintiff was sent a right to sue letter and this lawsuit is timely. **See Exhibit B**.


## CAUSE OF ACTION


### I. Title VII – Gender Discrimination

101.   Dr. Wexler adopts and incorporates herein by reference each and every allegation made in paragraphs 1 – 93 above.

102.   "42 U.S. Code § 2000e–2 - Unlawful employment practices" states:

"(a) EMPLOYER PRACTICES It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."


103.   **"42 U.S. Code § 2000e – Definitions" states**

"(k) The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise….."

A.    **SINGLE-MOTIVE CLAIM**

104.   Defendant, motivated by Plaintiff's status as a female, discriminated against Plaintiff in violation of Title VII by discharging her and then suing her.

B.    **MIXED-MOTIVE CLAIM**

105.   Alternatively, Defendant motivated in part by Plaintiff's status as a female and motivated in part by other reasons, discriminated against Plaintiff in violation of Title VII by discharging her and then suing her.

106.   Plaintiff requests a trial by Jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Eve Wexler, respectfully prays for the following

relief:

(a) Judgment in Plaintiff's favor against Defendant that includes the following:

(i) back pay in amount equal to the income Dr. Wexler has lost, plus

interest;

(ii) front pay in an amount equal to the income Dr. Wexler will lose in the

future including, but not limited to, retirement income;

(iii) general damages in an amount that will fully compensate Dr. Wexler for the

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment

of life, and loss of enjoyment of her chosen career Dr. Wexler has experienced

and will experience in the future due to defendants' unlawful conduct;

(iv) punitive damages.

(b) Declaratory relief;

(c) An award of attorney's fees and costs of litigation as authorized by Title VII

and 42 U.S.C. Sec. 1988; and

(d) Such other relief that this Honorable Court deems just and proper.

Dated: May 9, 2016

/s/ Shimshon Wexler
Shimshon Wexler (GA Bar No 436163)
315 W Ponce de Leon Ave Suite 250
Decatur, GA 30030
212-760-2400
917-512-6132 (fax)
shimshonwexler@yahoo.com

# EXHIBIT A

Kennesaw Pediatrics PC
at The Exchange at Wade Green
3745 Cherokee St #401
Kennesaw, GA 30144
Phone: 770-429-1005
Fax: 770-429-8005

Dear Dr. Wexler,

I am attaching a copy of your Separation Agreement and General Release. Please sign and return.

Your actions, which are both a breach of your employment agreement and a violation of your duties of loyalty and faithful service, have imposed significant costs on us. You should know that we must now obtain locum coverage to cover your absence, which is very costly. Losing a physician also damages our reputation in that, as patient reviews show, parents perceive any loss of a doctor as reflecting negatively on the practice. More importantly, it disrupts the continuity of patient care.

It is also expensive to recruit a new doctor. Recruiters charge $25,000 plus expenses. In house recruitment can be less costly, but more difficult, uncertain and time-consuming, requiring expenditures on advertising, travel, clinic down time, and wining & dining prospects. There are also State/Federal/DEA/AAP dues and subscriptions when a new doctor joins us and that we must pay and legal expenses attendant to the preparation of each employment agreement.

Accordingly, this Separation Agreement provides that you reimburse us for your $5,000 signing bonus, as required by your employment agreement. The Separation Agreement also obligates you to pay us an additional $5,000, essentially to cover a small part of the damages you have caused. Under the Separation Agreement, as under your employment agreement, you must also obtain tail insurance coverage.

The Separation Agreement also contains a mutual release of claims and a mutual non-disparagement clause.

Dr. Long

Kennesaw
Pediatrics

website: www.kennesawpediatrics.com
email: info@kennesawpediatrics.com

# KENNESAW PEDIATRICS, P.C.

3745 Cherokee ST NW #401
Kennesaw, GA 30144
770-429-1005
770-429-8005 fax

## Separation Agreement and General Release

CONFIDENTIAL

May 19, 2014

Dr. Eve Oster Wexler
1003 Briarvista Way NE
Atlanta, GA 39329

Re: Separation Agreement and General Release

Dear Dr. Wexler:

This letter proposes the following Separation Agreement and General Release ("Agreement") between you and Kennesaw Pediatrics, P.C. (the "Practice") regarding the terms of your separation from the Practice. All references in this Agreement to "you" refer to Dr. Eve Oster Wexler and all references to "we" refer to the Practice.

## I. Background

A.    You were employed by the Practice as pediatrician. You and the Practice have agreed to terminate your employment relationship. The reason for the termination is that it was in appropriate, and a violation of your employment agreement, to solicit our physicians and nurses to go into practice with you. Nevertheless, instead of firing you, we have agreed that you may resign, subject to the terms of this Agreement, effective as of May 15, 2014.

B.    Accordingly, per this Agreement, your employment is terminated as of May 15, 2014.

C.    This Agreement extends the duration and scope of some of your post termination covenants contained in your Employment Agreement, as described in Section 4 of this Agreement.



## II. Terms of Agreement

In order to effect the termination of your employment and to provide you with certain benefits that you would not otherwise be entitled to, you and the Practice agree as follows:

1.    **No Severance or Bonus**.  You are not entitled to severance payments.  You have earned compensation per our ordinary practices through May 15, 2014, with your last paycheck to be issued in the ordinary course on or about Friday, May 23, 2014.  You are not entitled to a quarterly, year-end or profit sharing bonus for 2014.  You waive all of your unused vacation and CME days for 2014 and are not entitled to payment with respect to either.

2.    **Completion of Records and Good-bye Letter**.  We believe that you have completed all unfinished medical records.  However, you agree to promptly complete all unfinished medical records if we locate any additional unfinished records.  You agree to advise us of any potential patient problems that you have not already recorded.  You agree to draft a very favorable and glowing letter about your time at the Practice, in form reasonably acceptable to us.

3.    **Repayment of Bonus, Reimbursement of Costs and Waiver of Compensation Claims**.  You were paid a $5,000 Starting Bonus under your November 20, 2013 Physician Employment Agreement (the "Physician Employment Agreement").  As per the terms of your Physician Employment Agreement with the Practice, you agree to repay this $5,000 bonus.  You further agree to pay the Practice an additional $5,000 to cover the costs and efforts to recruit and train you.  You agree to repay these amounts, which total to $10,000, within 30 days of this Agreement.  Additionally, you waive any claim to unpaid vacation days and any claim to any bonus or profit sharing for 2014, or any other compensation of any kind.

4.    **Expanded Post Termination Obligations in Your Employment Agreement and In this Agreement**.

      A.  <u>Post Termination Covenants – Expanded Covenants</u>.  You acknowledge and agree to perform all post termination obligations of your Physician Employment Agreement dated November 20, 2013, including Section 7, Section 8, Section 9.13 and Section 9.14 thereof, provided, however, you agree to increase the Restricted Area in Section 7 of your Employment Agreement to a 20 mile radius of the Practice's main office, and agree not to solicit any patients you treated (or their parents), regardless of where they live.  In other words:  for the two year

2



period beginning May 15, 2014 and ending May 14, 2016 (i) you agree not to practice pediatric medicine on behalf of yourself, or on behalf of any other person or entity (regardless of whether it is a private practice, hospital or other service provider), directly or indirectly, within a 20 miles radius from our office, and (ii) you will not, directly or indirectly, alone or in any capacity, solicit or in any manner attempt to solicit, suggest to or induce any person or persons employed by the Practice to terminate or leave his or her employment with the Practice (whether full or part time) and accept employment or a contract position elsewhere (whether full or part time), and (iii) you will not call upon or solicit any patient of the Practice (or parent or legal guardian of any patient) who you treated or saw in a professional capacity at our office during your employment with the Practice for purposes of providing pediatric medical services to such patient on behalf of yourself or any other person (regardless of where the patient or parent or legal guardian is then living). You agree that the duration of each restrictive covenant is automatically extended during any period that you violate it.

B.     Tail Coverage. You agree to purchase tail coverage within 30 days of the date of this Agreement as contemplated by Section 9.13 of your Physician Employment Agreement and to show proof of the same (the Practice acknowledges that you may elect a financing or payment option with the insurance provider that contemplates the payment of the premium over time and that you will not likely have paid the insurance company the full premium within such 30 day period; the Practice further acknowledges that once you have purchased the tail coverage, paid for it in full, and delivered evidence thereof to the Practice, you no longer have an annual duty to certify to the Practice the existence of such coverage).

5.     **You Release the Practice**. Except as provided in the last sentence of this Section 5, on behalf of yourself and anyone claiming through you, you irrevocably and unconditionally release, acquit and forever discharge the Practice and its subsidiaries, divisions, predecessors, successors and assigns, as well as each of their respective past and present officers, directors, employees, shareholders (including Mark A. Long), trustees, joint venturers, partners, and anyone claiming through them (hereinafter "Releasees" collectively), in each Releasees individual and/or corporate capacities, from any and all claims, liabilities, promises, actions, damages and the like, known or unknown, which you have had, now have or may have up to the date of this Agreement against any of the Releasees, including but not limited to those claims, liabilities, promises, actions, damages and the like, known or unknown, arising out of or relating to your employment with the Practice and/or the termination of your employment with the Practice. Such claims you release include, but are not limited to claims for unlawful employment

3



discrimination (*e.g.*, sex discrimination, pregnancy-based discrimination and/or sexual harassment) and claims arising under or based on Title VII of the Civil Rights Act of 1964, as amended; the Employee Retirement Income Security Act of 1974, as amended, the Rehabilitation Act of 1973, as amended; the Americans with Disabilities Act; the Occupational Safety and Health Act of 1970, as amended; the National Labor Relations Act of 1935, as amended; the Fair Labor Standards Act of 1938, as amended; the Family and Medical Leave Act of 1993, as amended; the Age Discrimination in Employment Act, as amended; the Older Workers Benefit Protection Act, as amended; Section 1981 of the Civil Rights Act of 1866; the Equal Pay Act of 1963, Section 1985 of the Civil Rights Act of 1871; and any other state or federal equal employment opportunity law, public policy, order, or regulation affecting or relating to the claims or rights of employees. Claims you release also include claims for disputed wages; claims for wrongful discharge and/or breach of any alleged employment contract; and claims based on any tort, such as invasion of privacy, defamation, fraud and infliction of emotional distress. You agree not to bring any legal action against any of the Releasees for any claim waived and released under this Agreement and that you represent and warrant that no such claim has been filed to date. You further agree that should you bring any type of administrative or legal action arising out of claims waived under this Agreement, you will bear all legal fees and costs, including those of the Releasees. This Section 5 does not apply to claims for breach of this Agreement and does not apply to any claims related to professional malpractice of the Practice or its employees.

6.     **The Practice Releases You**. Except as provided in the last sentence of this Section 6, the Practice irrevocably and unconditionally releases, acquits and forever discharges you, from any and all claims, liabilities, promises, actions, damages and the like, known or unknown, which the Practice has had, now has or may have up to the date of this Agreement against you, including but not limited to those claims, liabilities, promises, actions, damages and the like, known or unknown, arising out of or relating to your employment with the Practice and/or the termination of your employment with the Practice. This Section 6 does not apply (i) to claims for breach of this Agreement (including the expanded post termination covenants you agreed to in Section 4 of this Agreement), (ii) to claims of breach of your post termination obligations under your Physician Employment Agreement, or (iii) to any claims related to professional malpractice by you and any rights to indemnification or similar rights related to such malpractice.

7.     **Confidentiality of this Agreement**. You agree that you will not, directly or indirectly, disclose the fact of and terms of this Agreement to anyone other than

4

your immediate family, attorney, or tax advisor or as otherwise required by law. You agree to instruct your immediate family, attorney or tax advisor (and obtain their consent to this instruction) that the terms of this Agreement are confidential and not to be subsequently disclosed except as may be required by law. The Practice agrees to keep the terms of this Agreement confidential. This Section 7 does not apply to confidential internal deliberations of the Practice, including among its physicians.

8. **Binding Agreement**. This Agreement shall be binding on the parties and upon their heirs, administrators, representatives, executors, successors and assigns and shall inure to their benefit and to that of their heirs, administrators, representatives, executors, successors and assigns.

9. **Return of Practice's Property**. You represent that you have returned to me all of the Practice's property in your possession including, but not limited to, any pager, cellular phone, and all of the tangible and intangible property belonging to the Practice and relating to your employment with the Practice. You further represent and warrant that you have not retained any copies, electronic or otherwise, of such property.

10. **No Admission of Wrongdoing**. This Agreement shall not be in any way construed as an admission by the Practice that it has acted wrongfully with respect to you or any other person, or that you have any rights whatsoever against the Practice. This Agreement shall not be in any way construed as an admission by you that you have acted wrongfully with respect to the Practice or any other person.

11. **What if you do not sign this Agreement**. Even if you do not sign this Agreement, the Practice will pay you the compensation that you have earned through the date of your termination, any accrued vacation benefits, and accrued but unused CME in accordance with the Practice's then applicable policies. Similarly, even if you do not sign this Agreement, you will be offered benefits to which you are entitled under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), and you retain all benefits under the Practice's Corporate Simple IRA.

12. **Cooperation**. You will cooperate fully with the Practice in its defense of or other participation in any administrative, judicial or other proceeding arising from any charge, complaint or other action that has been or may be filed. The Practice will reimburse you of any reasonable out-of-pocket expenses incurred by you in providing such cooperation (but not any of your attorneys' fees and expenses);

5

except that in the case of a complaint arising out of medical malpractice that names you as a defendant (or co-defendant, or third party defendant) and/or names the Practice as a defendant but implicates your actions or inactions, the Practice shall not be obligated to reimburse you for any out-of-pocket expenses.

13.     **Non-Disparagement**.  You agree that you will not make any comments relating to the Practice or its employees which are critical, derogatory or which may tend to injure the business of the Practice, its reputation or the reputation of any of the employees of the Practice (including its President, Mark A. Long, M.D.).  The Practice (including its President, Mark A. Long, M.D.) agrees that it will not make any comments about you which are critical, derogatory or which may tend to injure you or your reputation (neither this Section 13 nor Section 9.14 of your Physician Employment Agreement applies to confidential internal deliberations of the Practice, including among its physicians, provided that no such comments are made maliciously).  Dr. Long shall instruct the Practice's physicians and other personnel participating in the deliberations that the discussions are confidential and cannot be divulged to anyone outside of the Practice.  With respect to any request for a referral from the Practice with respect to a prospective employer, the Practice shall provide only the following information:  conformation of Dr. Wexler's employment status, dates of employment, job title and current salary.

14.     **Information Provided To You**.  Although the parties believe that the federal Older Workers Benefit Protection Act of 1990 does not apply to you (because you are under 40), you acknowledge that you have been informed pursuant to the federal Older Workers Benefit Protection Act of 1990 that:

   (a)     You are advised to consult with an attorney before signing this Agreement;

   (b)     You do not waive rights or claims under the federal Age Discrimination in Employment Act that may arise after the date this waiver is executed;

   (c)     You have twenty-one (21) days from the date of this letter to consider this Agreement; and

   (d)     You have seven (7) days after signing this Agreement to revoke the Agreement, and the Agreement will not be effective until that revocation period has expired.

15.     **Severability**.  The provisions of this Agreement are severable. If any

6



provision is held to be invalid or unenforceable, it shall not affect the validity or enforceability of any other provision.

16. **Entire Agreement/Amendments**. This Agreement sets forth the entire agreement between you and the Practice and supersedes any and all prior oral or written agreements or understandings between you and the Practice concerning the subject matter of this Agreement. This Agreement may not be altered, amended or modified, except by a further written document signed by you and the Practice. The post termination obligations in your Physician Employment Agreement remain in full force and effect, including Sections 7, 8, 9.13 and 9.14 of your Physician Employment Agreement (except that you have agreed to expand your post termination obligations as described in Section 4 of this Agreement).

17. **Enforcement**. If any legal action or other proceeding, is brought for the enforcement of this Agreement or Sections 7, 8, 9.13 or 9.14 of your Physician Employment Agreement (including the expanded post-termination covenants in by Section 4 of this Agreement), the successful or prevailing party or parties shall be entitled to recover reasonable attorney's fees, court costs and all expenses if not taxable as court costs, incurred in that action or proceeding, in addition to any other relief to which such party or parties may be entitled.

18. **Choice of Law/Consent to Jurisdiction**. This Agreement shall be construed and enforced in accordance with the laws of the State of Georgia, other than its rules with respect to choice of law. Any proceeding arising out of or relating to this Agreement or any contemplated transaction may be brought in the courts of the State of Georgia, County of Cobb, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the proceeding shall be heard and determined only in any such court and agrees not to bring any proceeding arising out of or relating to this Agreement or any contemplated transaction in any other court. Process in any proceeding referred to in the first sentence of this section may be served on any party anywhere in the world.

19. **Your Representation by Counsel**. You represent that you fully understand your right to review all aspects of this Agreement with an attorney of your choice, that you have had the opportunity to consult with an attorney of your choice, that you have carefully read and fully understand all the provisions of this Agreement and that you are freely, knowingly and voluntarily entering into this Separation Agreement and General Release.

7



20.   **Severability**. If any provision of this Agreement or the application of any such provision to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances other than those to which it is so determined to be invalid and unenforceable, shall not be affected thereby, and each provision hereof shall be validated and shall be enforced to the fullest extent permitted by law.

21.   **Miscellaneous**. This Agreement maybe signed in counterpart, each of which shall be deemed an original. Execution of this Agreement by the Parties via facsimile signatures or electronic copies saved in PDF of signatures shall be deemed the same as original signatures. The bolded paragraph headings provided herein are for convenience only and shall not affect the interpretation of this Agreement.



8

If you are willing to enter into this Agreement, please signify your acceptance in the space indicated below, and return to me by June 7, 2014.

PLEASE READ CAREFULLY. YOU ARE GIVING UP ANY LEGAL CLAIMS THAT YOU HAVE AGAINST THE PRACTICE BY SIGNING THIS AGREEMENT.

Very truly yours,

**KENNESAW PEDIATRICS, P.C.**

By:

Mark A. Long, M.D.
President

Accepted and agreed to:

Date:

Eve Oster Wexler, M.D.

9

# **EXHIBIT B**

EEOC Form 161 (11/09)

### U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:   Eve O. Wexler
      1856 Berkeley Mews
      Atlanta, GA 30329

From:   Atlanta District Office
        100 Alabama Street, S.W.
        Suite 4R30
        Atlanta, GA 30303

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 410-2015-00459 | Deborah Parks,<br>Federal Investigator | (404) 562-6866 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ]  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ]  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X]  The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ]  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

MAY 0 2 2016

Bernice Williams-Kimbrough,
District Director

(Date Mailed)

Enclosures(s)

cc:   Carl L. Sollee, Esq.
      Sollee Law, LLC
      1376 Sheffield Drive, NE
      Atlanta, GA  30329

John Nelson, Esq.
The Nelson Law Chambers
2180 Satellite Boulevard
Suite 400
Duluth, GA 30097

Enclosure with EEOC
Form 161 (11/09)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS   --   **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**the Genetic Information Nondiscrimination Act (GINA), or the Age**
**Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you** *receive* **this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS   --   **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than** **2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION   --   **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request** **within 6 months** **of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*