## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

EVE WEXLER

         Plaintiff,

v.

KENNESAW PEDIATRICS, P.C.

         Defendant.

_____

**CIVIL ACTION FILE NO.**
1:16-cv-01491-TCB-JSA

## DEFENDANT'S INITIAL DISCLOSURES

**(1) If the defendant is improperly identified, state defendant's correct identification and state whether defendant will accept service of an amended summons and complaint reflecting the information furnished in this disclosure response.**

Defendant is properly identified.

**(2) Provide the names of any parties whom defendant contends are necessary parties to this action, but who have not been named by plaintiff. If defendant contends that there is a question of misjoinder of parties, provide the reasons for defendant's contention.**

There are no un-named necessary parties known to defendant.  Defendant does not

contend that there is a question of misjoinder of parties.

**(3) Provide a detailed factual basis for the defense or defenses and any counterclaims or crossclaims asserted by defendant in the responsive pleading.**

The factual basis set forth below is taken, in substantial part, from Kennesaw Pediatrics' Motion for Summary Judgment in *Kennesaw Pediatrics, P.C. v. Eve Wexler, M.D.*, Civil Action No. 14-cv-7660, before Judge Jackson (the "Superior Court Action") or from discovery taken in that matter.  Motions for summary judgment are pending before Judge Jackson in the Superior Court Action at the time of the initial filing of Defendant's Initial Disclosure.  Below, Plaintiff Eve Wexler is generally referred to as "Dr. Wexler" and Defendant is referred to as "Kennesaw Pediatrics."  References to Dr. Wexler's deposition refer to the deposition taken in the Superior Court Action.  Various affidavits refer to affidavits given in the Superior Court Action.  To avoid confusion, references to exhibits of Kennesaw Pediatrics have been deleted.

Eve Wexler M.D. worked as a pediatrician for Plaintiff Kennesaw Pediatrics, P.C. from December 23, 2013 until she was fired on May 15, 2014.  (Wexler Dep. 10:4-8 and 22:13-14).  Plaintiff fired Dr. Wexler because Dr. Mark A. Long believed that Dr. Wexler had solicited Dr. Jagdish Seth, another doctor at Kennesaw Pediatrics, and then denied doing so, in violation of her written employment agreement.  (Exhibit 5, Long Affidavit ¶20).

Dr. Wexler was a party to an employment agreement with Kennesaw Pediatrics.  (Wexler Dep. 11:25 – 12-10; 77:10-19).  Section 7.2 of the

employment agreement dated November 20, 2013 between Dr. Wexler and

Kennesaw Pediatrics provides:

> Physician will not, directly or indirectly, alone or in any capacity, solicit or in any manner attempt to solicit or induce any person or persons employed by the Practice before or during the Restricted Period to terminate his or her employment with the Practice and accept employment elsewhere.

Section 4.2 of the employment agreement provides as follows:

> The Physician shall exert his or her best efforts and devote substantially all of his or her professional time and attention to the practice of medicine as called for under the terms of this Agreement (except that Physician shall be required to work only as scheduled).  Physician shall fulfill his or her scheduled work blocks and on call duty, as may be scheduled by the Practice.  Except through the Practice, the Physician shall not accept an engagement to provide medical or consulting (including marketing or retention as an expert witness) services, whether as an employee, partner, associate, shareholder, independent contractor, or in any other capacity indirectly or directly (hereinafter collectively referred to as "Moonlighting Activities") without the written consent of Practice, which will not be unreasonably withheld.

In her Paragraph 37 of her Answer and Counterclaims in the Superior Court

Action, Dr. Wexler admits that "One of the other doctors at the practice . . . began

talking to Dr. Wexler about splitting off into another practice in a different part of

town."  At her deposition, Dr. Wexler admits that she discussed the topic of

opening a medical practice with Dr. Maria Axelrod. (Defendant's Dep. 17:16-18

and 69:24-25 and 70:1-8).  Dr. Wexler testifies:

Q:  Did you and Dr. Axelrod discuss the possibility of opening a new practice together?
A.    Yes.
Q.    What did you discuss?
A.    Can you clarify that question?
Q.    What was the conversation that you had with Dr. Axelrod about opening a new practice together?
A.    Dr. Axelrod told me that her husband always suggested that she open her own practice.  I said: My husband says the same thing.  She said: We should open a practice together.
Q.    How did you respond to that?
A.    I said: That's interesting; let's talk about it another time.  (Defendant's Dep. 17:16-25 and 18:1-9)

And later in the deposition:

Q.    Where any specific locations discussed?
A.    She mentioned Brookhaven would be nice because that's where she lives. (Wexler's Dep. 115:19-25 and 116:1-15.)

Dr. Wexler's motivation for opening a medical practice with Dr. Axelrod was dissatisfaction with the schedule.  (Wexler's Dep. 18:21-25 and 19:1-5).   At her deposition, she testified as follows:

Q.  What was the primary driver both on your own side for opening a new practice and, to the extent you know, the motivation of Dr. Axelrod for opening a new practice?
A.  We were both frustrated that the schedules came out so late the we had to make last minute child care arrangements.
Q.  The concern primarily was that the schedules were difficult to manage?
A.  Yes.  *Id*.

Dr. Wexler also admits that "at the urging of Dr. Axelrod, I asked Dr. Seth if she had ever thought about opening her own practice." (Wexler's Dep. 21:4-17). She approached Dr. Seth on May 14, 2014. (Wexler's Dep. 21:14-17).

In an e-mail exchange dated May 12, 2014 and initiated by Dr. Wexler, Dr. Wexler wrote to Dr. Axelrod and asked whether June 1 would be a good date to have a planning meeting to discuss the new practice. (Axelrod Affidavit ¶11 and ¶12). Dr. Axelrod wrote back: "June 1st works for me. Do you want to talk to Jagdish on wednesday? I am really excited about the idea!" Dr. Wexler writes back: "Yes, I'll talk to her then and go from there. And so am I! Can you tell?!" (Wexler Dep. 89:22 – 92:12, Wexler Dep. Exhibit 5). This e-mail was not available to Dr. Long at the time he fired Dr. Wexler.

Although in this e-mail Dr. Wexler clearly expresses her "excitement" about opening a medical practice with Dr. Axelrod, in her deposition, Dr. Wexler characterizes her interest as being "intrigued" but denies being excited about the idea. (Wexler Dep. 20:18-25).

In her affidavit, Dr. Jagdish Seth testifies that Dr. Wexler approached her about the idea of opening a medical practice with Dr. Wexler and Dr. Axelrod. Dr. Seth testifies:

at the office Dr. Wexler approached me about whether I was interested in

opening a pediatrics office with Dr. Wexler and Dr. Axelrod. She made clear that she and Dr. Axelrod were discussing and exploring the idea of opening an office and wanted me to join. She invited me to a dinner planning meeting, with details to be formalize afterwards. She was hopeful, I think, of having an easier schedule, with less call and fewer hospital rounds. I said that I had to go, she said that I did not have to decide now.  (Seth Affidavit ¶5).

Dr. Wexler seemed excited about the idea of opening a practice and she was also serious in her proposal.  She was not joking when she approached me. (Seth Affidavit ¶6).

Dr. Seth then notified Dr. Long, as follows:

 . . . Meredith Andrews mentioned a group retreat/trip that Dr. Long was planning for the practice.  I felt bad that Dr. Long was planning these nice things while some physicians were planning on leaving and taking staff with them.  I communicated to Meredith that not all the physicians were looking out after Dr. Long's good, Meredith suggested that I mention it to Dr. Long. (Seth Affidavit ¶7).

As I was leaving that day, Dr. Long approached me.  I think he saw the look on my face and asked what's going on.  That is when I told him that Dr. Wexler had approached me about opening an office.  I told him that Dr. Wexler had asked me to join a practice with her and Dr. Axelrod and that she had invited me to a planning dinner about the new practice.  (Seth Affidavit ¶ 8).

Dr. Axelrod, who was also an employee of Defendant, testifies in her

affidavit that:

In May 2014 Dr. Wexler approached me about the idea of opening up a practice without having to deal with call or hospital rounds. I thought this sounded like an interesting idea. She also stated that she felt it was easy to obtain financing. We had as I recall at least 2 discussions of the topic. (Axelrod Affidavit ¶4).

At the time of our discussions about opening a new practice, Dr. Wexler was looking for other employment opportunities closer to her home. As best I could tell, based on our conversations, she was not happy at Kennesaw Pediatrics because of the scheduling.  (Axelrod Affidavit ¶5).

Dr. Wexler was not always satisfied with the schedule at KP, which includes regular office hours, hospital rounding and call. She sometimes seemed upset about scheduling challenges. While the schedule is prepared well in advance, it can occasionally change, causing planning challenges for the doctors. We can be very busy at times, Dr. Wexler thought that by opening a practice there would be less extensive call duty and hospital rounding and would be in better control of her schedule. The scheduling of pumping, however, was not an issue in the discussions or a motivating factor, as best I recall.  I also viewed a practice without hospital rounding or call as desirable (most Physicians probably would) but was not sure this was realistic. (Axelrod Affidavit ¶6).

Kennesaw Pediatrics' offices are in Kennesaw, and both Dr. Wexler and I live in Atlanta.  The commute is long.  Dr. Wexler and I were both interested in opening an office location closer in town, where we live.  I do not recall specifically mentioning Brookhaven, where I live, as being a desirable location for our new practice, but I may have said that.  (Axelrod Affidavit ¶7).

In our discussions, Dr. Wexler mentioned that her husband had suggested to her that she open her own practice. I think I said that my husband had suggested the same thing to me.  (Axelrod Affidavit ¶8).

In my discussions with Dr. Wexler, we discussed hospital rounds and their inconvenience at times.  Some where in our discussions, I do not recall who raised this issue to ask Dr. Seth, or if it just came up naturally in our conversations, Dr. Wexler and I agreed that it would be better to have another doctor on board with the new practice. This made sense to me because hospital rounds are typically shared by physicians at a Pediatric office (and are generally shared by the Pediatricians at KP).  I agreed that if we were to open an office it would be conceptually better if there were three of us than just two.  (Axelrod Affidavit ¶9).

Dr. Axelrod also confirms the May 12, 2014 e-mail exchange she had with

Dr. Wexler and states:

> In my e-mail from May 12, 2014 to Dr. Wexler . . . I express my genuine enthusiasm for the idea of opening up a pediatrics practice with Dr. Wexler. I understood Dr. Wexler to be expressing her enthusiasm as well by her response to my e-mail.  (Axelrod Affidavit ¶12).

Dr. Mark A. Long, the president and medical director of Kennesaw

Pediatrics, P.C. testifies that:

> Dr. Jagdish Seth brought to my attention that Dr. Maria Axelrod and Dr. Eve Wexler were discussing opening their own medical practice and that Dr. Wexler approached Dr. Seth about joining them.  I asked Dr. Axelrod if this was true, and she admitted that she and Dr. Wexler had discussed opening their own practice together but did not have definitive plans.   After speaking with Dr. Axelrod, I then asked Dr. Wexler whether she was planning on opening up a practice and taking any employees with her.  Dr. Wexler completely denied that she had discussions over opening a new practice with Dr. Axelrod or that she had approached or solicited Dr. Seth about the idea of opening a medical practice.  I promptly terminated her for cause.  I believed Dr. Seth and Dr. Axelrod were speaking, essentially, the truth and that Dr. Wexler was lying.  It was Dr. Wexler's dishonesty that irritated me more than her actual violation of the non-solicitation covenant in her employment agreement.  (Long Affidavit ¶20).

Dr. Wexler testifies that she received good reviews from Dr. Long in

January 2014 and in early May 2014.  (Wexler Dep. 15:6 – 21 and 64:16 – 65:9).

Notwithstanding these good reviews, she continued to look for other jobs.  (Wexler

Dep. 16:19 – 17:12; Axelrod Affidavit ¶5).  Dr. Long confirms that he gave Dr.

Wexler good reviews and was satisfied overall with Dr. Wexler's performance.

8

(Long Affidavit ¶12).  Dr. Long's motivation for firing an otherwise skilled and valuable employee was that she was soliciting Kennesaw Pediatrics' employees in connection with planning to open a new medical office.  (Long Affidavit ¶20 & 35).  Dr. Long also believed that Dr. Wexler was not honest about her plans.  *Id*.  However, Dr. Wexler denies that Dr. Long gave her an opportunity to explain herself.  (Wexler's Dep. 66:3-19).  In her Complaint in this Federal court action, Dr. Wexler denies being given a change to respond the allegations. Plaintiff Complaint ¶67 ("Plaintiff was not given an opportunity to respond to Dr. Long's allegations that **Plaintiff was trying to steal his employees** and open a new practice during this phone call" (emphasis added)).  She does, however, describe how Dr. Long perceived her actions: that of stealing his employees.  In her own allegations in her Complaint, she shows that Dr. Long was not motivated, at all, by an animus against Dr. Wexler's sex or that she had another week or two of pumping at work, but rather because of Dr. Wexler's solicitations.

**Facts primarily related to Dr. Wexler's obligation to return the $5,000 signing bonus.**

Section 2.2 of Dr. Wexler's employment agreement sets forth the terms under which she is obligated to repay the $5,000 signing bonus she had been paid. (Plaintiff's Exhibit 2).  Section 2.2 of the employment agreement reads as follows:

Bonus.  Physician is entitled to a signing bonus of $5,000 (the "Signing Bonus").  If Physician obtains hospital privileges on the Medical Staff of each of Wellstar Kennestone Hospital, Marietta Georgia, Northside Hospital, Atlanta and Children's Healthcare Of Atlanta At Scottish Rite Hospital within two months of signing this Agreement (not the Start Date), she is entitled to an additional $5,000 bonus (the "Privileges Bonus").  However, if she obtains hospital privileges after two months of the signing of this Agreement, or obtains privileges at some but not all of the listed hospitals, she is not entitled to this Privileges Bonus.  If Physician's employment is terminated within 12 months of the Start Date of this Agreement, Physician agrees to re-pay the Signing Bonus and the Privileges Bonus to the Practice, as follows:  **If Physician's employment terminates within the first six months of signing this Agreement, then Physician agrees to repay the full amount of the Signing Bonus and Privileges Bonus** (e.g., $10,000, assuming a Privileges Bonus was paid), and if Physician's employment is terminated between the 7th and 12th month after the signing of this Agreement, the Physician shall be deemed to have earned a fraction of the Signing Bonus and Privileges Bonus equal to the number of days Physician was employed by the Practice during such 7th to 12th months divided by 180 days, and shall repay to the Practice the balance (for example, if Physician's employment terminates on the 120th day during this 7th to 12th month period and Physician was paid the Signing Bonus and the Privileges Bonus, Physician would repay the Practice $3,333.33 and would retain $7,666.67 of the bonuses).  After six months of employment, Physician is also eligible for additional bonuses and profit sharing as determined by the Practice.  **The Practice makes no specific guarantees as to any additional bonuses or profit sharing.**  (emphasis added for convenience).

Dr. Wexler's employment with Kennesaw Pediatrics terminated on May 15, 2014 and she signed her employment agreement on November 20, 2013. Accordingly, Dr. Wexler was terminated within six months of the date she signed her employment agreement.  After Dr. Wexler was terminated, Dr. Long demanded that Dr. Wexler return the $5,000 signing bonus to Kennesaw Pediatrics in a letter

dated on or about May 19, 2014.  However, Dr. Wexler did not return the $5,000 because she claimed Kennesaw Pediatrics owed her more than that.  (Wexler Dep. 23:14 – 16).  Dr. Wexler set forth her reasons in a letter to Kennesaw Pediatrics dated June 6, 2014, alleged various counterclaims and demanded $35,000.

### Pumping related facts

When Kennesaw Pediatrics hired Dr. Wexler, it knew that she would be pumping breast milk at work.  Kennesaw Pediatrics made accommodations for Dr. Wexler's pumping needs: it provided her with two, paid pumping breaks per day, in addition to lunch, and in January 2014 provided her with a private, secured office in which to pump.  Dr. Wexler alleges that, when she started in Decemberr 2013, she was initially required to pump in a bathroom; Kennesaw Pediatrics denies this.  She later pumpted in clean, unoccupied, but unsecured patient rooms. She was not satisfied with these accommodations, and in January 2014 Kennesaw Pediatrics provided her with a secured, private office to use during her (paid) pumping breaks.

Kennesaw Pediatrics treats pumping mothers who are physicians better than it treats non-pumping physicians, in the sense that it provides paid pumping breaks. It provided these breaks to Dr. Wexler while she was employed.  Dr. Long instructed Shavonn Ring, the Scheduling Coordinator, to accommodate Dr.

Wexler's pumping scheduling requests, and these instructions applied during the entire time Dr. Wexler was employed by Kennesaw Pediatrics.  Ms. Ring in fact accommodated all of Dr. Wexler's pumping-related scheduling needs.

Dr. Wexler, in her deposition, states that during her May 2014 review that Dr. Long "asked me how I was doing and then told me that I was a great physician and all the patients loved me and the nurses loved me and he loved having me on board." (Wexler depo. 64:24 – 65:6).  During this informal review with Dr. Long, Dr. Wexler expressed satisfaction and happiness with her job.

Dr. Wexler alleges at her deposition (and/or in her Complaint) that at her review in May 2014, but after Dr. Long had given her a glowing review, she told Dr. Long that she would be pumping for an additional two weeks and that he reacted negatively to this and became "visible irriated and frustrated" (Plaintiff's Complaint ¶85).  Dr. Long denies this allegation.  The topic of Dr. Wexler's pumping, however, was discussed at a meeting with Dr. Wexler, Dr. Brugner and Dr. Long in May 2014 sometime before her informal review, and the conclusion was that she was going to continue to take pumping breaks because she felt her child was having some trouble with solid food (although it may be that Dr. Wexler had planned, at one time, to stop pumping earlier).  Dr. Long did not become angry with her at either meeting.

**Why Dr. Long did not fire Dr. Axelrod.**

Dr. Long did not fire Dr. Axelrod because (1) it was Dr. Wexler, not Dr. Axelrod, who actually solicited Dr. Seth, (2) Dr. Axelrod had been with the practice longer than Dr. Wexler, the practice had invested money in assisting Dr. Axelrod with board prep, and (3) Dr. Axelrod essentially admitted the allegations made by Dr. Seth whereas Dr. Wexler denied them.  Dr. Wexler also damaged her standing with Dr. Long by indicating, at her review in May 2014, that she was happy at work, yet at the same time Dr. Wexler was actively looking to start a new practice with Dr. Axelrod.  Importantly, Dr. Long believed that Dr. Wexler was more of the instigator than Dr. Axelrod and that Dr. Wexler was more complicit. Also, Dr. Axelrod was very business like and concilliatory in her discussions with Dr. Long, who at that time did not have the e-mail exchange between Dr. Wexler and Dr. Axelrod dated May 12, 2014.

**Dr. Wexler acknowledged that Dr. Long had a good reason for firing her**.

In her Cross-Motion for Summary Judgment in the Superior Court Action, Dr. Wexler's counsel argue (and in the quoted paragraph, "plaintiff" refers to Kennesaw Pediatrics):

> "Plaintiff may not like its employees discussing the possibility one day of opening their own medical practice while at work.  Plaintiff, subject to any

employment agreement, may even have a right to terminate employees for voicing their dreams and discussing plans for the future." Wexler's Brief p. 9.

**Dr. Axelrod and Dr. Wexler provide testimony that Dr. Wexler was unhappy about the schedule at Kennesaw Pediatrics not about pumping accommodations or any alleged discriminatory conduct of Dr. Long**.

Dr. Wexler was not always satisfied with the schedule at KP, which includes regular office hours, hospital rounding and call. She sometimes seemed upset about scheduling challenges. While the schedule is prepared well in advance, it can occasionally change, causing planning challenges for the doctors. We can be very busy at times, Dr. Wexler thought that by opening a practice there would be less extensive call duty and hospital rounding and would be in better control of her schedule. **The scheduling of pumping, however, was not an issue in the discussions or a motivating factor, as best I recall.** I also viewed a practice without hospital rounding or call as desirable (most Physicians probably would) but was not sure this was realistic. (Axelrod Affidavit ¶6) (emphasis added).

During the courses of her employment at KP, I do not recall Dr. Wexler complaining generally about the practice, about working conditions here, **about her pumping schedule or access to suitable quarters to pump. When Dr. Wexler would take her pumping breaks, which took place in Tara Douglas' office, Tara would have to leave that office. I think Dr. Wexler would have preferred not to have to pump in Tara's office, and viewed it as an inconvenience, because Dr. Wexler did not like the imposition on Tara. Except for this inconvenience, she seemed satisfied with the pumping accommodations.** I do recall her complaining about scheduling frustrations. I do recall her venting about being required to work a day she had not been scheduled because of the inconvenience and difficulty in arranging child care. I do not recall her making adverse statements about Mark A. Long, M.D., except in the context of complaints about having to work a day she was not scheduled to because of the difficulties of arranging child care. As I mentioned above, one of the reasons Dr. Wexler was enthused about opening a pediatrics practice was to

have greater control of scheduling and no hospital rounds. (Axelrod Affidavit ¶15) (emphasis added).

At her deposition Dr. Wexler complains that the schedule for a month came out one or at most two weeks before the month. (Wex. Dep. 13: 4 – 25; 14: 1 – 24).

Q.  What was the primary driver both on your own side for opening a new practice and, ot the exteny you know, the motivation of Dr. Axelrod for opening a new practice?
A.  We were both frustrated that the schedules came out so late and we had to make last minute child  care arrangements.
Q.  The concern primarily was that the schedules were difficult to manage?
A.  Yes. (Wexler Dep. 18:21 – 19:5).

**Dr. Wexler's allegations that Dr. Long was motivated, in whole or in part, by discriminatory animus when he fired her are not supported by facts.**

From Dr. Wexler's deposition:

Q.      In paragraph 31 it states that the week before Dr. Long spoke with Dr. Wexler about her separation, she had a meeting with him at which he gave her positive reviews and said that he was in the process of hiring another physician to help with the scheduling.  Tell me about that conversation, please.
A.      It was a lunch with Dr. Long and Dr. Brugner where he asked me how I was doing and then told me that I was a great physician and all the patients loved me and the nurses loved me and he loved having me on board.
Q.      So you believe that Dr. Long was satisfied with your performance?
A.      I believe Dr. Long wanted me to think he was satisfied with my performance.
Q.      Do you think that Dr. Long was not satisfied with your performance?
A.      I cannot speak to what he thought.
Q.      What else happened at that meeting?

15

A.      I volunteered that I was going to be – that I had already started to taper off my pumping sessions.

Q.      So it was generally a positive meeing because he was telling you he thought you were doing a great job?

A.      Until he found out that I was still pumping.  He was under the belief I had already stopped.

Q.      So at that meeting you recall that Dr. Long became angry with you because you stated you would be pumping for two additional weeks?

A.      Yes.  I had already stopped one of my pumping sessions.  It was tappering down.  So I told him I would be done completely in another two weeks.

Q.      Do you recall when that meeting was?

A.      The week prior to my termination.

Q.      And you were terminated on the 15th, is that correct, May 15th?

A.      Yes.

Q.      In paragarph 33 you state that soon therafter Dr. Long called Dr. Wexler and told her he wished her to separate from employment.  Paragraph 34 goes on to state the Dr. Long stated that the reason for separation was because Dr. Wexler was speaking with other doctors in the practice about leaving and starting their own practice in contravention of her employment agreement.  When he said that to you, did you have anthing to say back to him?

A.      I was not given the opportunity.

Q.      He didn't give you the opportunity to say anything?

A.      Nope.

Q.      How long was the conversation?

A.      Perhaps a minute.  I don't recall.

Q.      Then you go on to state the the proffered reason was merely a pretext to justify Dr. Wexler's termination based on her request for accommodations to pump breast mild for her infant child.  Why do you think that?  Why do you think that his termination of you was or his statements were a pretext to justify terminating you based on your request for accommodation to pump breast milk?  Because you were almost done.  You only had two more weeks to go, and he just said he was very satisfied with you.  Does that make sense?

A.      I am not sure what the question is there.

Q.      Good objection.  I'll start again here.  In paragraph 35 – I'm going to read it again, "The proffered reason was merely a pretext to justify Dr. Wexler's termination based on her request for accommodation to pump breast milk for her infant child."  Why do you believe that was a pretext, the proffered reason?

A.     Dr. Long was clearly extremely upset that I was still pumping when he thought I wasn't, and it made no sense to me that I was being fired for something I had not done.

**Q.     You believe you were fired because you told Dr. Long you were going to pump for two addition weeks?**

**A.     Yes.**  (Wexler Dep. 64:16 – 67:25) (emphasis added).

Q.     Even though you have been pumping ever since you started five or so months before?

A.     Yes.

. . . .

**Q.     And you believe that that extra two weeks triggered something in his mind that caused him to want to fire you?**

**A.     I have no other explanation for why I was fired.** (Wexler Dep. 68:1 – 22) (emphasis added).

And later:

Q.     Why do you think you were fired?

A.     I believe Dr. Long was upset that I was still taking pumping breaks, and he decided that he didn't want to have to deal with that anymore.

Q.     What is the basis for that belief?

A.     The week before I was terminated, he found out I was still taking a pumping break and was aghast and upset when he found out.  A week later, I was fired for what seemed to be a made up reason.  (Wexler Dep. 119: 13 – 22).

In May 2014, prior to Dr. Wexler's informal review, there was a meeting with Dr. Wexler, Dr. Brugner and Dr. Long where Dr. Wexler's pumping schedule was discussed and where Dr. Wexler indicated that she would be pumping at work for some additional weeks in May 2014.  Dr. Wexler did not raise the topic of pumping at her informal review.  At no time did Dr. Long become angry with Dr. Wexler over her plans to continue to pump in May or at any other time.

17

Moreover, the whole idea that Dr. Long would fire Dr. Wexler because of two extra weeks of pumping (once per day), (i) after having just given Dr. Wexler a great review, (ii) having hired her knowing she would be pumping (Wexler Dep. 119:23 – 120:1), and (iii) having accommodated her requests for two pumping breaks per day during working hours and paid her during those pumping breaks for over five months (which he was not legally required to do), makes no sense, especially in light of the costs of recruiting new physicians.

### Allegations about productivity, even if true, are not evidence of sexual discrimination or harrassment.

Dr. Wexler alleges that, during her employment, Dr. Long harrassed her about her productivity, which was allegedly low because of her pumping breaks, and that her low productivity would affect her bonus.  At her deposition, Dr. Wexler says that there are e-mails when this occurred; however, these alleged e-mails were never produced and presumably do not exist.  Dr. Wexler acknowleded in her deposition that she was not entitled to a productivity bonus under her employment agreement, regardless of her actual productivity, during the first six months of her employment.

Dr. Long never harrassed Dr. Wexler about anything.  Dr. Wexler's productivity, however, was not great.  Dr. Wexler was written up in later April 2014, in the month before the glowing review that Dr. Long gave her, by the

nursing manager for basically goofing off at work on a Saturday when she was supposed to be the primary doctor.   Nothwithstanding this issue, and not withstanding her productivity, Dr. Long still gave her a great review.

At her deposition:

Q.     So Dr. Long told you that you would be getting a productivity bonus notwithstanding the fact that he said your productivity was low?
A.     Yes.
Q.     During the course of your employment, how often did y'all discuss productivity bonuses?
A.     A few times.  I don't recall exactly.
Q.     Where those e-mails or oral conversations?
A.     Both.
Q.     Does your employment contract discuss productivity bonuses?
A.     The contract states that productivity bonuses is to be paid after six months of employment.
Q.     Where you employed for six months?
A.     No. (Wexler Dep. 48:25 - 49:14)
……
Q.     You go on to state that, in fact, Dr. Long utilized the promise of the productivity bonus to harass Dr. Wexler for taking breaks to pump milk for her infant child.  Tell me about that.
A.     Every time we discussed productivity, he reminded me that mine was lower because of my pumping breaks and so my bonus would be lower.
Q.     But that you would still get a bonus?
A.     He always implied that I would get a bonus.
Q.     Do you believe pumping affected your productivity?
A.     If it did, it was negligible.  (Wexler Dep. 50:3 – 15).

Comments about Dr. Wexler's productivity during the first six months of her employment are not harrassment based on sex or harrassment based on her status as a pumping mother.  In any case, Dr. Long never harrassed Dr. Wexler about

pumping or even about productivity, although they did discuss productivity.  None of the alleged discriminatory statements impacted Dr. Long's review of Dr. Wexler: he gave her a great review shortly before he fired her, but only after he learned she was soliciting Kennesaw Pediatrics' employees about opening a new practice.

**Statements from Dr. Wexler's Affidavit in the Superior Court Action.**

- "Dr. Wexler does admit that she did engage in conversations with other employees about what it would be like to one day open their own medical practice." (Defendant's MSJ Brief pp. 3 – 4, citing Wexler Affidavit ¶¶31-34, 39).

- In her affidavit, Dr. Wexler states that "Dr. Axelrod asked me to approach Dr. Seth about discussing opening a medical practice together." (Wexler Affidavit ¶43).

- Dr. Wexler states "Dr. Axelrod suggested I ask Dr. Seth to dinner where we could all discuss work, and what it would be like to maybe one day open our own medical practice." (Wexler Affidavit ¶45).

**(4) Describe in detail all statutes, codes, regulations, legal principles, standards and customs or usages, and illustrative case law which defendant contends are applicable to this action.**

42 U.S.C. § 2000e to e-17.

Single Motive Claim:

*Hite v. Hill Dermaceuticals, Inc.* (11th Cir. 2015) (unpublished).

*Anderson v. Dunbar Armored, Inc.*, 678 F. Supp.2d 1280 (N.D. Ga. 2009)

*Holland v Gee*, No. 11-11659 (11th Cir. Apr. 17, 2012) (Under Title VII, a

plaintiff may prevail on a claim by showing that her pregnancy "was a motivating

factor" for an employment decision. 42 U.S.C. § 2000e-2(m) . . . In cases involving

circumstantial evidence, we apply the burden-shifting framework of *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).  Under McDonnell

Douglas, the plaintiff must initially establish a prima facie case, which generally

consists of the following: 1) the plaintiff was a member of a protected class, 2) she

was qualified to do the job, 3) she was subjected to an adverse employment action,

and 4) similarly situated employees outside of the protected class were treated

differently . . .  Thus, once a plaintiff makes a prima facie case, "the burden of

production shifts to the employer to articulate a legitimate, nondiscriminatory

reason for its actions." . . .  Once the employer identifies a legitimate,

nondiscriminatory reason for its decision, the presumption of discrimination

disappears, and the burden shifts back to the plaintiff "to demonstrate that the

proffered reason was not the true reason for the employment decision." . . .  The

plaintiff must show "weaknesses, implausibilities, inconsistencies, incoherencies,

or contradictions" in the employer's rationale.  Thus, "the question becomes

whether the evidence," when viewed as a whole, "yields the reasonable inference

that the employer engaged in the alleged discrimination."  Put another way, the

issue is whether there is "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." (citations omitted)).

*Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed2d 207 (1981).

Pretext may be established "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or in indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450, 450 U.S. at 256, 101 S.Ct. 1089.

Mixed-Motive Claim

*Quigg v. Thomas County School Dist.*, 814 F.3d 1227 (2016) (When an employee raising a mixed-motive claim relies solely on remarks that indirectly evidence discrimination, the employee must show the circumstances surrounding the remarks create a genuine issue of material fact that the employer "Actually relied on her [sex or] gender in making its decision." at 1241).

Same decision defense – Section 2000e-5(g)(2)(B) of Title VII (if an employer can demonstrate it "would have taken the same action in the absence of the

impermissible motivating factor, the court . . . shall not award damages" or certain

equitable relief.)  42 U.S.C. ¶2000e-5(g)(2)(B).  *See Quigg* at 1242 for discussion.

Pregnancy – Pumping at work

The 11th Circuit has not ruled on whether pumping is a pregnancy related medical

condition, but the plaintiff in unpublished *Hite v. Hill Dermacueticals, supra*, was

pumping.  See *Hicks v. City of Tuscaloosa* (N.D. Ala. 2015) for a discussion, and

holding that pumping is a pregnancy related medical condition.

**(5) Provide the name and, if known, the address and telephone number of each individual likely to have discoverable information that you may use to support your claims or defenses, unless solely for impeachment, identifying the subjects of the information. (Attach witness list to Initial Disclosures as Attachment A.)**

See Attachment A.

**(6) Provide the name of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence. For all experts described in Fed.R.Civ.P. 26(a)(2)(B), provide a separate written report satisfying the provisions of that rule. (Attach expert witness list and written reports to Initial Disclosures as Attachment B.)**

None

**(7) Provide a copy of, or description by category and location of, all documents, data compilations or other electronically stored information, and tangible things in your possession, custody, or control that you may use to support your claims or defenses unless solely for impeachment, identifying the**

subjects of the information. (Attach document list and descriptions to Initial Disclosures as Attachment C.)

See Attachment C.

(8) In the space provided below, provide a computation of any category of damages claimed by you. In addition, include a copy of, or describe by category and location of, the documents or other evidentiary material, not privileged or protected from disclosure on which such computation is based, including materials bearing on the nature and extent of injuries suffered, making such documents or evidentiary material available for inspection and copying under Fed.R.Civ.P. 34. (Attach any copies and descriptions to Initial Disclosures as Attachment D.)

None

(9) If defendant contends that some other person or legal entity is, in whole or in part, liable to the plaintiff or defendant in this matter, state the full name, address, and telephone number of such person or entity and describe in detail the basis of such liability.

None.

(10) Attach for inspection and copying as under Fed.R.Civ.P. 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments to satisfy the judgment. (Attach copy of insurance agreement to Initial Disclosures as Attachment E.)

None.

RESPECTFULLY SUBMITTED, this 28th day of June, 2016.

s/ Carl L. Sollee, Esq.
Bar No. 000242
Attorney for the Defendant Kennesaw Pediatrics
Sollee Law, LLC
1376 Sheffield Drive, NE
Atlanta, GA 30329
Phone: (404) 633-8223
E-mail:  carl@solleelaw.com

**Attachment A – Witness List**

Mark A. Long, M.D. – Dr. Wexler's employment, reasons for her firing.  Dr. Long, an employee of Defendant, may be contacted through Defendant's counsel.

Jagdish Seth, M.D. – Dr. Seth can testify to Dr. Wexler's solicitation of her.  Dr. Seth, an employee of Defendant, may be contacted through Defendant's counsel.

Maria Axelrod, M.D. – Dr. Axelrod can testify to her discussions with Dr. Wexler and observations of Dr. Wexler while employed, including the discussions about opening a medical practice together.  Dr. Axelrod, an employee of Defendant, may be contacted through Defendant's counsel.

Diana Varnadore – possible witness, she can testify to policies and procedures, and the accommodations for Dr. Wexler's pumping schedule.  Ms. Long, an employee of Defendant, may be contacted through Defendant's counsel.

Tara Douglas – possible witness, former employee, Dr. Wexler used Ms. Douglas' office to pump.  Ms. Douglas is not longer an employee.  Defendant will attempt to confirm her contact information.

Shavonn Ring – scheduling coordinator.  Can testify to the scheduling of Dr. Wexler's pumping breaks.  Ms. Ring, an employee of Defendant, may be contacted through Defendant's counsel.

Karen Garrett – Nursing Manager.  She wrote up Dr. Wexler on April 24, 2014 for basically goofing off at work on a Saturday when she was supposed to be the primary doctor.  Ms. Garrett no longer works for Defendant and Defendant will attempt to confirm her contact information.

Briana Brugner – Dr. Wexler alleges that Dr. Brugner was present at Dr. Wexler's review, can also testify to pumping accommodations Kennesaw Pediatrics provides physicians.  She was present at a meeting in May 2014 when Dr. Wexler's pumping schedule was discussed.  Dr. Brugner, an employee of Defendant, may be contacted through Defendant's counsel.

**Attachment C – List of Documents**

Dr. Wexler's employment agreement

Employee Manual

May 12 e-mail exchange between Dr. Wexler and Dr. Axelrod

Affidavits used in the Superior Court Action

Dr. Wexler's Cross Motion for Summary Judgment in the Superior Court Action.

Dr. Wexler's deposition taken in the Superior Court Action.

Copy of Dr. Wexler's schedule showing pumping breaks

Dr. Long's letter dated May 21, 2014 to Dr. Wexler

Dr. Wexler's June 6, 2014 letter to Dr. Long

Dr. Long's June 15, 2014 e-mail exchange with Dr. Wexler

April 2014 write up of Dr. Wexler

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

EVE WEXLER

              Plaintiff,

v.

KENNESAW PEDIATRICS, P.C.

              Defendant.

_____

**CIVIL ACTION FILE NO.**
1:16-cv-01491-TCB-JSA

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 28, 2016, I electronically filed the foregoing **DEFENDANT'S INITIAL DISCLOSURES** with the Clerk of Court using the CM/ECF system which will send email notification to counsel of record as follows:

Carl L. Sollee, Esq.
Shimshon Wexler, Esq.

I further certify that the foregoing document was prepared using 14 point Times New Roman font.

This the 28th day of June 2016.

*s/ Carl L. Sollee*
Carl L. Sollee
Georgia Bar No. 000242
Attorney for the Defendant Kennesaw Pediatrics
Sollee Law, LLC
1376 Sheffield Drive, NE
Atlanta, GA 30329
Phone: (404) 633-8223
E-mail:  carl@solleelaw.com