# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

EVE WEXLER,           )
                          )
       Plaintiff,        )       CASE NO. 1:16-cv-1491-TCB-JSA
                          )
v.                     )
                          )
KENNESAW PEDIATRICS, PC  )
                          )
       Defendant.      )
                          )
                          )
                          )
                          )

## PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED

Pursuant to Fed. R. Civ. P., Rule 56 and Local Rule ND Ga 56.1., Plaintiff responds to Defendant's Statement of Undisputed Material Facts as to Which There is No Genuine Issue to be Tried.

1. Plaintiff Eve Wexler M.D. worked as a pediatrician for Defendant Kennesaw Pediatrics, P.C. from December 23, 2013 until she was fired on May 15, 2014. (Wexler Dep. 10:4-8 and 22:13-14; Brief Exhibit 1 sets forth all the citations to the depositions).

Response:

Admitted

2. Dr. Wexler was a party to an employment agreement with Kennesaw Pediatrics. (Wexler Dep. 11:25 – 12-10; 77:10-19).

Response:

Admitted

3. Section 7.2 of the employment agreement dated November 20, 2013 prohibits Dr. Wexler from directly or indirectly soliciting persons employed by the practice. (Exhibit 2).

Response:

Denied; Section 7.2 only prohibits directly or indirectly soliciting persons employed by the practice to terminate his or her employment with the practice and also accept employment elsewhere. Section 7.2 of the contract is below with emphasis added.

"7.2 Non-Solicitation. From and after the commencement of Physician's employment with the Practice, Physician is subject to the non-solicitation covenants in this Section 7 .2**. Physician will not, directly or indirectly,**

**alone or in any capacity, solicit or in any manner attempt to solicit or induce any person or persons employed by the Practice before or during the Restricted Period to terminate his or her employment with the Practice and accept employment elsewhere.** During the Restricted Period, Physician will not call upon or solicit any patient of the Practice (or parent or legal guardian of any patient) who was seen or treated by Physician in a professional capacity at the Office during the time Physician was employed by Practice for purposes of providing pediatric medical services to such patient on behalf of herself or any other person (provided, that this sentence shall not apply to patients living more than 30 miles away from the practice)."

4. Dr. Wexler received good reviews from Dr. Long in January 2014 and in early May 2014. (Wexler Dep. 15:6 – 21 and 64:16 – 65:9; Long Dep. 101:4-16;105:17-20; 106:1-20).

Response:

Admitted

5. After receiving a good review from Dr. Long in May 2014, she indicated to Dr. Long and Dr. Brugner that she was happy at Kennesaw Pediatrics. (Brugner Dep. 103:20-24; Long Dep. 106:1-20).

Response:

Admitted

6. Notwithstanding these good reviews, and unknown to Defendant at the time, she continued to look for other jobs. (Wexler Dep. 16:19 – 17:12; Axelrod Dep. 60:23-25; Exhibit 8, Axelrod Affidavit ¶5).

Response:

Admitted

7. Dr. Wexler testified that "at the urging of Dr. Axelrod, I asked Dr. Seth if she had ever thought about opening her own practice." (Wexler Dep. 21:4-17).

Response:

Admitted

8. Dr. Wexler directly or indirectly solicited Dr. Seth. *Id*.

Response:

Objection, Local Rule 56.1B.(1) makes clear that," The court will not consider any Fact… (c) stated as an issue or legal conclusion." This statement of material fact is an issue or legal conclusion. Further, Plaintiff denies this fact and cites to Wexler Dep. Pg 81-82, lines 24-21.

9. She approached Dr. Seth on May 14, 2014. (Wexler Dep. 21:14-17).

Response:

Admitted

10. Dr. Wexler testifies:

Q. Did he [Dr. Long] mention that he had heard that you were talking with others about forming a new practice?

A. He said: I heard that you have been soliciting my employees to open another practice.

Q. You didn't -- you were not able to respond to that?

A. I started to say: That's not -- and he interrupted me, and I did not finish that statement.

Q. So you started to deny it, and he cut you off?

A. No. I was never going to deny it. I was going to tell him what happened.

(Wexler Dep. 102: 3 – 25).

Response:

Objection, Local Rule 56.1B.(1) makes clear that the numbered statement be separate and concise statement and this is neither separate or concise and is not a statement. Notwithstanding this objection, Plaintiff responds to Defendant's number 10, admitted that this is an accurate reflection of Dr. Wexler's testimony..


11. Dr. Seth testifies that Dr. Wexler "had already talked to another doctor" (Dr. Axelrod) and "said that her and Dr. Axelrod were in conversation about starting their own practice . . . And she wanted to know if I would be interested in joining them." (Seth Dep. 11:2 – 12-15; see also Seth Dep. 15:8-14; 18:14-18; 18:24-19:2).

Response:

Objection. SMF 11 is vague and ambiguous, and relies upon the credibility of both Dr. Seth and Dr. Long for determination of what Dr. Long knew about the context and substance of the conversation before firing Dr. Wexler. Otherwise, SMF 11 is denied. Notwithstanding the denial, Plaintiff shows that Dr. Seth never told Dr. Long of this occurrence prior to Dr. Long firing Dr. Wexler (Seth Dep. 21:6 - 12; 21:16 - 20), rather Dr. Long only called Dr. Seth and asked her whether or not Dr.

Wexler had approached her and Dr. Seth said one word-"yes" prior to firing Dr.

Wexler. [Seth Dep. Pg 20, 1-11, Pg 35, 6-10]  Dr. Axelrod's name was not

mentioned on the phone call but was only mentioned after Dr. Wexler was fired.

[Seth Dep Pg. 20-21, 1-21]


12. Dr. Seth communicated this news to Dr. Long. (Exhibit 7, Seth Affidavit ¶8;

Seth Dep.20:1-16, 21:6-21; Long Dep. 36:12-23).

Response:

Objection. SMF 12 is vague and ambiguous. Otherwise, denied. Notwithstanding

this denial, Plaintiff admits that after Dr. Wexler was fired by Dr. Long, Dr. Seth

communicated the context and details to Dr. Long ( Seth Dep. 21:4-21).


13. Dr. Jagdish Seth testifies:

Q. What did she tell you, exactly?

A. That she wanted to open up a practice with Dr. Axelrod and that she would like

me to join her in opening that practice,… (Seth Dep. 15:8-11).

A. ....I can only tell you what she told me, which was that she was planning to open up a practice and she wanted me to join, *and she had already talked to another doctor about it*. (Seth Dep.18:24-19:2).

Q. Okay, great. And in paragraph 7 it says that, I felt bad that Dr. Long was planning nice things while some physicians were planning on leaving and *taking staff with them*. What did you mean by that?

- - - -

A. So in my mind I was thinking on one hand this man is trying to plan fun things for us and our spouse, and on the other hand, like, some people are planning to not even be there, and *planning things behind his back*. (Seth Dep. 121:11-15; 122:5-9).

(emphasis added)

Response:

Objection, Local Rule 56.1B.(1) makes clear that the numbered statement be separate and concise statement and this is neither a separate or concise  statement. Notwithstanding this objection, Plaintiff responds to Defendant's number 13, admitted that this is accurately reflects Dr. Seth's testimony as cited. Plaintiff notes that Dr. Seth never testified that Dr. Wexler wanted to take any staff with her other than her other than Dr. Seth and Dr. Axerlrod. Denied that Dr. Seth provided this

information to Dr. Long prior to Dr. Long's firing of Dr. Wexler (Seth Dep. 21:4-21).

14. Dr. Long testifies that Dr. Seth conveyed the solicitation to him:

A. …..I just feel awful. Dr. Wexler approached me about starting her own practice and she wanted me to join her and Dr. Axelrod in going off and starting this new practice and *she intends to ask some of your nurses to quit and leave with them* too. (Long Dep. 36:18-23).

Response:

Denied. Dr. Seth never told Dr. Long of this occurrence prior to Dr. Long firing Dr. Wexler rather Dr. Long only called Dr. Seth and asked her whether or not Dr. Wexler had approached her and asked whether she asked you to leave the practice to which Dr. Seth said one word-"yes"- prior to firing Dr. Wexler. [Seth Dep. Pg 20, 1-11, Pg 35, 6-10] Dr. Axelrod's name and the solicitation was not mentioned by Dr. Seth on the phone call but was only mentioned after Dr. Wexler was fired. [Seth Dep Pg. 20-21, 1-21] Further, Dr. Long's credibility, together with the cited contradictions of his testimony by Dr. Seth, creates a contested factual issue which should be determined by a jury. There is no evidence other than Dr. Long's self

serving testimony that Dr. Wexler wanted to take any staff with her other than Dr. Axelrod and Dr. Seth.

15. Defendant fired Dr. Wexler on March 15, 2014 because Dr. Mark A. Long believed that Dr. Wexler had solicited Dr. Jagdish Seth and then denied doing so. (Long Dep. 33:14 – 34:10, 36:18-23, 120:23-25, 151: 6 – 152:2; Exhibit 22, Wexler Separation Letter; Exhibit 9, Long Affidavit ¶20).

Response:

Objection, Local Rule 56.1B.(1) makes clear that," The court will not consider any Fact… (c) stated as an issue or legal conclusion." This statement of material fact is an issue or legal conclusion, and indeed, the question of why Dr. Long fired Dr. Wexler forms the basis of this case. Notwithstanding this objection, Plaintiff denies Dr. Wexler was fired March 15th 2014, and admits she fired May 15th 2014. For all other purposes, Plaintiff denies SMF 15 and contends that Dr. Long's 'belief' is refuted by Dr. Wexler (Wexler Dep 67:22-25) creating an issue of material fact to be determined by a jury.

16. Dr. Long asked Dr. Wexler whether she had "made any plans or made any attempts to leave the practice and take any employees with you?" Dr. Long testifies that Dr. Wexler denied that she had. Dr. Long then fired her. (Long Dep. 36:7 - 38:17; Wexler Dep. 22:16-23, 102:14 - 103:16).

Response:

Objection. Defendant's statement violates Local Rule 56.1B(1) because the statement is not separate and concise rather it is a spliced statement. Notwithstanding this objection, Plaintiff denies that Dr. Long asked her any questions. [Wexler Dep. Pg 22, 10-23] Plaintiff  SMF 16 accurately reflects Dr. Long's testimony but contends that his credibility is in question and contradicted by Dr. Wexler's testimony as relates to SMF 16 and limits Plaintiff's admission to the accuracy of Dr. Longs testimony and the fact that Dr. Wexler was fired at the end of the conversation referenced in SMF 16.


17. Dr. Wexler alleges that she did not deny Dr. Long's accusation, but was not allowed to answer. However, her "that's not" testimony could have been understood by Dr. Long as a denial. (Wexler Dep. 102: 3 – 25).

Response:

Denied. Dr. Wexler was not given an opportunity to deny Dr. Long's accusations

and thus could not answer other than saying "that's not" before being cut off.

Further, Dr. Long specifically testified that he would not have interpreted "that's

not" as a denial. [Long Dep. Pg 130-132, 21-7]

Page 132:

```
2 Q. ….. If she had said
3 that's not, would you have interpreted it as a
4 denial?
5 A. No. Because that's a fraction of a
6 sentence. That's not an apple. You got to wait to
7 see what the that's not.
```

18. Dr. Wexler also testifies that she "was not going to deny it" when Dr.

Long said to her "I heard that you have been soliciting my employees to open

another practice". (Wexler Dep. 102:16-25).

Response:

Denied. To clarify Plaintiff's denial of SMF 18, Plaintiff is testifying that she was

not given an opportunity to respond to the accusations against her and when she

said she was not going to deny the accusations she meant that she was going to

explain the occurrence and was not going to deny what happened; but was not

going to admit that she "solicited" employees at Kennesaw Pediatrics in violation

of the employment agreement ( Exhibit 2 to the motion for summary judgment);

(Wexler Dep. 24: 3 - 5, 102:22-25).

19. Dr. Wexler denied to Dr. Long that she had solicited his employees.

*Id.*

Response:

Denied. [Wexler Dep. 102:22-25).]

20. Dr. Wexler admitted that she, in fact, did solicit one or more of Kennesaw

Pediatrics' employees. *Id.*

Response:

Objection, Local Rule 56.1B.(1) makes clear that," The court will not consider any

Fact… (c) stated as an issue or legal conclusion." This statement of material fact is

an issue or legal conclusion. Whether Plaintiff did or did not solicit one or more of

Kennesaw Pediatrics' employees is an ultimate issue of the case and a legal

conclusion. Notwithstanding this objection, Denied. [Wexler Dep. Pg. 81-82, 24-

21; 102, 22-25; Pg 69, 18-23]

21. Dr. Long recalls his conversation with Dr. Wexler on May 15, 2014 as

13

follows:

I said Dr. Wexler, I need to ask you a question and I need an honest answer.

I said have you made any plans or made any attempts to leave the practice

and take any employees with you? No. No. I don't know what you're talking

about. I've not done anything like that. Are you sure? Yes. I don't know what

you're talking about. I don't know what you're talking about. So you have not

approached any of the physicians or any of the employees and have no plans

to leave the practice and take any employees or physicians with you? No.

No, I have not. That's when I said Dr. Wexler, I believe you to be lying to

me and I don't trust any of your answers and you're formally terminated.

(Long Dep. 38:4 – 17).

Response:

Objection, LR 56.1 requires a statement of material facts to be a separate and

concise statement. Notwithstanding this objection, Admitted that citation supports

an accurate reflection of Dr. Long's testimony. Denied that Dr. Long's recollection

is an accurate reflection of the conversation that took place. (Wexler Dep. 102: 16 -

17. 102: 20-21). Dr. Long's testimonial recollection is disputed, creating an issue

of material fact.

22. Dr. Wexler alleges in her Complaint that Dr. Long accused her of trying to "steal his employees", "yelled at me the whole time", and then fired her. (Complaint ¶¶66 – 67; compare Wexler Dep. 22:16-19, 69:18-19, 102:14-25; Exhibit 6, Wexler Affidavit ¶54).

Response:

Objection this statement of material fact cites to a pleading which is specifically not allowed under Local Rule 56.1. Notwithstanding this objection, admitted.


23. Dr. Wexler also alleges that Dr. Long accused her of violating her non-solicitation clause. (Complaint ¶¶89 - 91, and Wexler Dep. 66:9-19).

Response:

Objection this statement of material fact cites to a pleading which is specifically not allowed under Local Rule 56.1. Notwithstanding this objection, denied. The Complaint at paragraphs 89-91 is referring to the time period months after Dr. Long had fired her and not on the same phone call.  Further Wexler Dep. Pg. 66, 9-19 is referring to counterclaims filed by Dr. Wexler in the state court action.


24. Dr. Wexler has characterized her approach to Dr. Seth variously as a "joke" or a "dream." (Exhibit 6, Wexler Affidavit ¶39; Wexler 16:14-19;

Seth Dep. 100:17-101:6)

Response:

Denied, Wexler Affidavit Para. 39 states in full "I viewed the discussions with Dr.

Axelrod as a dream, a joke, and as something that maybe one day we could do, but

not at any time in the near future. Further Plaintiff denies that Wexler Dep Pg. 16,

14-19 and Seth Dep. Pg. 100-101, 17-6 support this statement.


25. Dr. Long testified that he spoke to Dr. Axelrod before he fired Dr.

Wexler on May 15, 2014. (Long Dep. 39:8-15).

Response:

Admitted Dr. Long so testified at the citation provided. Deny that Dr. Long

actually spoke to Dr. Axelrod about conversations between Dr. Wexler and

Axelrod prior to firing Dr. Wexler. Dr Axelrod's testimony contradicts that of Dr.

Long:

Q:" Okay. Earlier in the deposition, Mr. Wexler was asking about your

conversation with Dr. Long., and as I recall your testimony, he called you and

asked you some questions about Dr. Wexler. As best as you can recall, what did

Dr. Long ask you?

A: He asked if anyone had asked me about opening a practice.

Q: And what did you answer?

A: I answered Dr. Wexler had."

(Axelrod Dep 70: 7 - 15 ).

Q: "Uh -huh- (affirmative). At that time, did he -- did y'all discuss Dr. Wexler -- did Dr. Long state what his plans were with respect to Dr. Wexler in at that conversation?

A: He did tell me that he had fired her." (Axelrod Dep. 71: 5 - 9).

The above quoted testimony demonstrates a contradiction in testimony creating a genuine issue of material fact as to truth of SMF 25, creating a jury issue.


26. May 15, 2014 was Dr. Wexler's child's birthday and Dr. Wexler was not scheduled to work, and did not work on May 15, 2014, and was not in the office. (Exhibit 10, Long Declaration ¶19).

Response:

Objection, Long Decl. Para. 19 does not refer to Dr. Wexler's child's birthday. Notwithstanding this objection, admitted.


27. Dr. Axelrod testified that she thought Dr. Long had already fired Dr. Wexler when they spoke, but is unsure. (Axelrod Dep. 52:5-11).

Response:

Admitted


28. In any case, when Dr. Long called Dr. Axelrod to ask her whether anyone had approached her about opening a medical practice, (1) she admitted having conversations with Dr. Wexler about opening a new practice, (2) she stated to Dr. Long that Dr. Wexler had solicited her about the idea of opening a new practice, and (3) she stated that she had no intention of leaving. (Long Dep. 37:9 - 38:1; Exhibit 9,Long Affidavit ¶20; Axelrod 43:16-25 and 45:1-16, 71:15-19).

Response:

Objection Defendant's statement violates Local Rule 56.1B(1) because the statement is not separate and concise rather it is 3 separate statements combined as one. Notwithstanding this objection, Plaintiff denies SMF fact (2) and further states that there is no citation to Dr. Axelrod's testimony or Dr. Long's testimony where it states or conveys that Dr. Wexler solicited Dr. Axelrod about the idea of opening a new practice. Admitted as to (1) and (3).


29. Dr. Seth's testimony supports Dr. Axelrod's testimony that Dr. Wexler solicited Dr. Axelrod. (Seth Dep. 18:24 - 19:2; Axelrod Dep. 43:16-25).

Response:

Objection Defendant's statement violates Local Rule 56.1B(1) because the statement is stated as an issue or legal conclusion. Notwithstanding this objection, Denied. Dr. Axelrod neither in the citation in SMF 29 nor anywhere else testified that she had been "solicited" by Dr. Wexler. Indeed, Dr. Axelrod testified there was nothing wrong with having a conversation with Dr. Wexler about opening a practice. [Axelrod Dep 39-40,18-5] Further, Dr. Seth does not use the word solicitation in any portion of her deposition nor does the citation in SMF 29 indicate that Dr. Wexler "solicited" Dr. Axelrod.

30. In Dr. Wexler's Affidavit and Deposition, Dr. Wexler admits to facts that constitute at least indirect solicitation. (Exhibit 6, Wexler Affidavit ¶¶ 42, 43, 45, & 74; Wexler Dep. 71:3-11; Complaint ¶¶53 - 56).

Response:

Objection Defendant's statement violates Local Rule 56.1B(1) because the statement is stated as an issue or legal conclusion. Further, the statement refers to a pleading.  Notwithstanding this objection, Denied. Plaintiff denies these citations support a legal, or any other conclusion that Plaintiff engaged in indirectly soliciting any person to leave employment with Kennesaw Pediatrics or accept

employment elsewhere let alone both of them. Neither Plaintiff's affidavit, her

deposition nor her complaint indicate that she engaged in indirect solicitation.


31. Indirect solicitation is cause to fire an employee under Dr. Wexler's

contract. (Exhibit 2, §6 and §7.2).

Response:

Denied. Section 6 of the contract does not mention solicitation or indirect

solicitation and it does not say that "indirect solicitation" is cause to fire Dr.

Wexler under her contract. Section 7.2 only prohibits directly or indirectly

soliciting persons employed by the practice to terminate his or her employment

with the practice and also accept employment elsewhere. Section 7.2 of the

contract is below with emphasis added.

"7.2 Non-Solicitation. From and after the commencement of Physician's

employment with the Practice, Physician is subject to the non-solicitation

covenants in this Section 7 .2**. Physician will not, directly or indirectly,**

**alone or in any capacity, solicit or in any manner attempt to solicit or**

**induce any person or persons employed by the Practice before or during**

**the Restricted Period to terminate his or her employment with the Practice**

**and accept employment elsewhere.** During the Restricted Period,

Physician will not call upon or solicit any patient of the Practice (or parent

or legal guardian of any patient) who was seen or treated by Physician in a

professional capacity at the Office during the time Physician was

employed by Practice for purposes of providing pediatric medical services

to such patient on behalf of herself or any other person (provided, that this

sentence shall not apply to patients living more than 30 miles away from the

practice)."


32. In Dr. Wexler's Complaint (Complaint ¶¶77, 78) and in her deposition she

flatly denies that she was fired for solicitation. Rather, she testified that she was

fired because she told Dr. Long that she was going to take pumping breaks at work

for two more weeks.

Dr. Wexler testifies:

Q. You believe you were fired because you told Dr. Long you were going to pump

for two additional weeks?

A. Yes.

. . .

Q. So you don't think it odd that Dr. Long would, a week prior to the time that he

fires you, tell you that you're a great doctor and people love you?

A. He told me that before he knew I was still pumping.

Q. And you believe that that extra two weeks triggered something in his mind that caused him to want to fire you?

A. I have no other explanation for why I was fired. (Wexler 67:22-68:22)

And

Q. Why do you believe you were fired?

A. I believe Dr. Long was upset that I was still taking pumping breaks, and he decided that he didn't want to have to deal with that anymore.

Q. What is the basis for that belief?

A. The week before I was terminated, he found out I was still taking a pumping break and he was aghast and upset about it when he found out. A week later, I was fired for what seemed to be a made up reason. (Wexler Dep. 119:13 – 22.)

Response:

Objection, number 32 violates the Local Rule 56.1 because it is neither a statement, concise nor separate. Further, it cites to a pleading. Notwithstanding this objection, admitted.

33. In her EEOC complaint, Dr. Wexler states that May 1 was the date

that Dr. Long found out about her continuing to take pumping breaks. (Exhibit 5).

Response:

Denied. Exhibit 5 to Defendant's MSJ page 4 of 11 which contains the EEOC

complaint states in Paragraph 2 that "On or around May 1, 2014, Dr. Mark Long,

questioned whether I was still lactating on the job. I responded yes. On May 15,

2014, I was discharged."

34. Dr. Wexler's motivation for opening a medical practice with Dr. Axelrod was

dissatisfaction with the schedule. (Wexler's Dep. 18:21-25 and 19:1- 5). At her

deposition, she testified as follows:

Q. What was the primary driver both on your own side for opening a new

practice and, to the extent you know, the motivation of Dr. Axelrod for

opening a new practice?

A. We were both frustrated that the schedules came out so late the we had to

make last minute child care arrangements.

Q. The concern primarily was that the schedules were difficult to manage?

A. Yes. *Id.*

Response:

Admitted in part. The citation only shows that one of Dr. Wexler's motivations for desiring to open a medical practice was dissatisfaction with the schedule.

35. In an e-mail exchange dated May 12, 2014 and initiated by Dr. Wexler, Dr. Wexler wrote to Dr. Axelrod and asked whether June 1 would be a good date to have a planning meeting to discuss the new practice. (Exhibit 4 and also Axelrod Dep. 73:11 – 74:10; Exhibit 8, Axelrod Affidavit ¶11 and ¶12).

Response:

Denied. Dr. Wexler never asked for a "planning meeting". The term is not mentioned in any emails from Dr. Wexler. Further Dr. Wexler proposed potentially having a dinner with their kids in this email.

36. Dr. Axelrod wrote back: "June 1st works for me. Do you want to talk to Jagdish on wednesday? I am really excited about the idea!" Dr. Wexler writes back: "Yes, I'll talk to her then and go from there. And so am I! Can you tell?!" (Wexler Dep. 89:22 – 92:14, Wexler Dep. Exhibit 5, Exhibit 4 hereto; Axelrod Dep. 74;11-19).

Response:

Admitted

37. Dr. Wexler testified that the "idea" referenced in the e-mail was dinner with two colleagues. (Wexler Dep. 91:6-24).

Response:

Admitted


38. Dr. Long did not have access to the May 12, 2014 e-mail until it was produced by Dr. Axelrod on September 17, 2014. (Long Dep. 40:3-6)

Response:

Denied. Dr. Long's credibility is in question in this case. The jury should decide this issue.


39. Like Dr. Wexler, Dr. Maria Axelrod is female. (Wexler Dep. 90:12 – 14).

Response:

Admitted


40. Dr. Axelrod was board certified and had privileges at both Northside and Wellstar. (Exhibit 8, Axelrod Affidavit ¶1).

Response:

Denied. Admitted only that Dr. Axelrod at the time of her affidavit was board certified in pediatric medicine. The affidavit doesn't refer to or relate to having privileges at Northside or at Wellstar.

41. Dr. Wexler was not board certified and never obtained privileges at Wellstar while she was employed at Kennesaw Pediatrics. (Wexler Dep. 26:9-25; Exhibit 11, Varnadore Affidavit ¶5).

Response:

Denied. Dr. Wexler was and is board certified in pediatrics at all times during her employment at Kennesaw Pediatrics. Her deposition does not mention whether she was or wasn't board certified in pediatric medicine. Otherwise, admitted that she did not obtain privileges at Wellstar.

42. Her employment agreement obligated Dr. Wexler to maintain privileges at Wellstar and two other hospitals. (Exhibit 2, Wexler Employment Agreement Section 4.1; Wexler Dep. Exhibit #3 Section 4.1).

Response:

Admitted. Plaintiff notes that Section 2.2 of the contract contemplates that it will

take time for a physician to receive and maintain privileges at the hospitals.:

Section 2.2 of the employment agreement states:

 If Physician obtains hospital privileges on the Medical Staff of

each of Wellstar Kennestone Hospital, Marietta Georgia, Northside

Hospital, Atlanta and Children's Healthcare Of Atlanta At Scottish Rite

Hospital within two months of signing this Agreement (not the Start Date),

she is entitled to an additional $5,000 bonus (the "Privileges Bonus").


43. She never obtained privileges at Wellstar while she was employed at

Kennesaw Pediatrics, although she had applied for them. (Wexler Dep. 26:9-25;

Exhibit 11,Varnadore Affidavit ¶5).

Response:

Admit.


44. While she was employed at Kennesaw Pediatrics, because she lacked

hospital privileges, she could not do hospital rounds and was limited in the type of

call she could handle. (Wexler Dep. 51:10-13).

Response:

Admitted.

45. Under her employment contract with Kennesaw Pediatrics, Dr.

Wexler received a signing bonus, but was not entitled to a productivity bonus in

the first six months. (Exhibit 2, Wexler Dep. Exhibit #3 Section 2.2)

Response:

Admitted

46. After receiving a great review from Dr. Long, at the meeting with Dr.

Brugner in May 2014, Dr. Wexler alleges that she then mentioned to Dr. Long that

she would be pumping for an additional two weeks. (Wexler Dep. 64:16 – 65:25;

Long Dep. 101:4-16, 105:17-20, 106:1-20; Brugner Dep. 67:14 - 68:6, 70:19 -

71:4).

Response:

Admitted

47. Dr. Wexler alleges, but Dr. Long denies, that he became angry at this

news, and said "you were supposed to be done in May". (Wexler Dep. 65:20-25,

Long Dep. 145:20-23).

Response:

Denied that the citation to the depositions shows what Dr. Long said, otherwise admitted.

48. In response to Dr. Wexler's decision to continue to take pumping breaks at work that she mentioned at the meeting with Dr. Long and Dr. Brugner in May 2014, Dr. Long said "it was fine." (Brugner Dep. 73:11 – 74:20).

Response:

Denied. Dr. Brugner's credibility is in question in this case. Dr. Wexler testified that Dr. Long became angry at this news. (Wexler Declaration ¶'s 18 - 21).

49. Dr. Long testified that he already knew that Dr. Wexler would be continuing to pump at work prior to the meeting with Dr. Wexler and Brugner in May 2014. He learned this from Shavonn Ring, the Scheduling Coordinator. (Long Dep. 26:2:15; 145:2 - 14).

Response:

Denied. Dr. Long's credibility is in question for this case and it presents an issue of fact. Further, the citation at 145 shows that Dr. Long thinks that Dr. Wexler would be continuing to pump not that he knew she would be continuing to pump. As to

the citation on page 26, admitted that the statement accurately reflects that

testimony.

50. Dr. Wexler also informed Dr. Long in an e-mail dated March 6, 2014

that she would not be pumping past May, when her child turned one. (Exhibit 18,

Long Dep. Exhibit 6).

Response:

Admitted. Plaintiff in responding to accusations that her productivity was not on

par with other physicians because of her pumping breaks explained specific

examples of her productivity and how she was just as productive as other

physicians and also stated in parenthesis that she "won't be pumping after May

(when he turns one)".

51. Dr. Wexler emailed Shavonn Ring on February 4, 2014 about

scheduling pumping breaks and notified Shavonn that she would be finished by the

middle of May. (Exhibit 17, Wexler Deposition, Exhibit 6)

Response:

Admitted

52. Dr. Wexler emailed Shavonn Ring on April 2, 2014 informing

Shavonn Ring could, remove the morning pumping break on May 5th and leave

the afternoon spot for 3 more weeks. (Exhibit 16, originally presented in Wexler

Deposition, Exhibit 6)

Response:

Admitted


53. Kennesaw Pediatrics has a long-standing policy of allowing employee

mothers to pump at work. (Axelrod Dep. 61:20-25, 62:1-12; Brugner

Dep.100:11-14; Long Dep. 95:1-8; Seth Dep. 116:2-17; Wexler Dep. 93:2-4).

Response:

Denied that the Wexler deposition citation shows this statement to be a fact. Dr.

Wexler merely testified that she was accommodated to pump at work. Denied that

the Long deposition citation shows this statement to be a fact. Dr. Long testified

that he would accommodate employees who wanted to pump. Denied that Dr.

Brugner's testimony at this citation shows this statement to be a fact. Dr. Brugner

testified that it was not unusual for employees to pump at work. Denied that the

Seth deposition at this citation shows that they had a long-standing policy. She had

not even worked at the practice long enough to know whether or not there was

long-standing policy or not. She merely mentions that she knew of employees who pumped at work. Dr. Axelrod specifically testifies that she does not know of any policy.

54. When Dr. Long hired Dr. Wexler, he knew that she had an infant son and would be pumping at work. (Long Dep. 8:5-8, 100:20-22, 13:3-9; Exhibit 12, Ring Affidavit ¶ 2; Wexler Dep. 119:23- 120:1).

Response:

Admitted

55. Dr. Long instructed Shavonn Ring, the Scheduling Coordinator, to accommodate Dr. Wexler's pumping needs. (Long Dep.13:3-9; Exhibit 12, Ring Affidavit ¶ 2).

Response:

Admitted

56. Ms. Ring scheduled Dr. Wexler for two, 30 minute pumping breaks per day, plus lunch. (Long Dep. 20:13-18; Exhibit 12, Ring Affidavit ¶ 3).

Response:

Admitted


57. Dr. Wexler recalls that she had two pumping breaks. (Wexler Dep. 39:8-11, 58:17 – 59:12, 94:1-5).

Response:

Admitted


58. The precise time of the afternoon break was changed at Dr. Wexler's request in January 2014. (Long Dep.144:18-25; Exhibit 16 & 17, Long Dep. Defendant's Exhibits 2 & 3; Wexler Dep. 58:17 – 59:12, 94:1-5; Exhibit 12, Ring Affidavit ¶ 11).

Response:

Admitted


59. At Dr. Wexler's request, starting May 5, 2014, she had one pumping break (plus lunch) and Dr. Long approved those plans. (Long Dep. 26:6-9; Brugner Dep. 65:17-25; Wexler Dep. 65:23-25; Exhibit 12, Ring Affidavit ¶9).

Response:

Admit that Dr. Long's deposition citation supports  the SMF 59  assertion that Dr.

Long was aware that Dr. Wexler had requested that Shavonn Ring schedule one

pumping break plus lunch pumping. The Brugner citation is as follows:

"Q: So you have no knowledge of him ever being aware of her pumping breaks?

A: Well, I know at one point we had talked about where the schedule was going

when I had met with him and her, but that's, I think, the other -- only time that I

was brought in you know, regarding the pumping breaks and what was happening.

But, otherwise, I don't know if he was involved as much as just Shavonn

setting it up. I just --"

Dr. Brugner later goes on to testify that this meeting took place on May 5th

or 6th. (Brugner Dep. 68: 4 -6), and that she was spontaneously called into the

meeting (Brugner Dep. 68 : 18 -21).Plaintiff contends Dr. Brugner's testimony

creates a factual issue as to when Dr. Long became aware that Dr. Wexler was

continuing to take pumping breaks after the month of April.

Denied that ; Exhibit 12, Ring Affidavit ¶9 does not address the either who

made the schedule requests or whether Dr. Long approved the schedule.

Admit that Dr. Wexler requested one pumping break plus lunch (for

pumping) starting May 5th 2014.

60. At the time she was fired, she had only one (or two) week(s) of

pumping left. (Wexler Dep. 65:20-66:5; EEOC complaint, Exhibit 5; Exhibit 6,

Wexler Affidavit ¶¶23 and 27).

Response:

Admitted


61. Dr. Wexler testifies that she was fired because she told Dr. Mark A.

Long in early May 2014 that she was going to take a pumping break at work for

two more weeks. (Wexler Dep. 67:22 – 68:22, 119:13 – 22).

Response:

Admitted


62. Dr. Wexler testifies that Dr. Long chastised her for low productivity and that

this was really harassment for her pumping breaks. (Wexler Dep. 56:16 –

57:14; 50:8 – 10).

Response:

Admitted


63. Dr. Long did not harass Dr. Wexler over her pumping breaks. (Long

Dep. 21:12 – 22:8).

Response:

Denied. Dr. Wexler testified as to Dr. Long's harassment toward her because of her pumping breaks (Wexler Dep. 50: 3 - 15; 57: 21 - 25; 58: 1 - 16; 120: 12- 15).


64. Dr. Long discussed productivity with Dr. Wexler only once or twice.

*Id*.

Response:

 Admit that Dr. Long's deposition testimony (22:8) is that he discussed productivity *bonuses* [emphasis added] with Dr. Wexler once or twice. Dr. Wexler disputes this indicating there were several discussions related to her productivity as a physician/employee as well with respect to promised bonuses. (Wexler Dep 50: 3-15; 52: 13 - 17; 56: 23 to 57: 9;). This dispute creates a factual issue to be determined by a jury.


65. In a February 26, 2014 e-mail Dr. Long, in response to a request for an income guarantee, informed Dr. Wexler that her productivity was low. (Long 67:13 -72:25; Exhibit 19, Exhibit 5 to Long Deposition).

Response:

Denied. Dr. Wexler did not ask for an income guarantee (Exhibit 19, Exhibit 5 to Long deposition). Dr. Wexler forwarded to Dr. Long a question from a mortgage broker/underwriter regarding a minimum base pay. Dr. Wexler's contract had language indicating her employment was on an "as needed" basis, and her hours could be increased or decreased. (*Id.*). Dr. Long goes on to state that Dr. Wexler's productivity is "…not on par with others. " (*Id.*).

66. However, the words of the February 26, 2014 e-mail are not harassing. Id.

Response:

Objection. This statement violates L.R. 56.1(B) (1)  This statement of material fact is an issue or legal conclusion. Whether the email is harassing or part of an ongoing and continuing series of harassing statements as Plaintiff contends is an ultimate issue of the case and a legal conclusion. Otherwise Denied that the words of the email were not harassing.

67. When she asked to move her afternoon pumping break in January 2014, Dr. Long is alleged to have said, "Oh, so you need more time for them to fill up." (Wexler Dep. 58:1-2).

Response:

Admitted, although Dr. Wexler disputes this event occurred in January 2014 as alleged.

68. Dr. Wexler also alleges that, when she started, someone told her to pump in the bathroom. (Wexler Dep. 59:13-23).

Response:

 Admitted.

69. Neither Dr. Long, Ms. Varnadore or any physician known to the practice told Dr. Wexler to pump in the bathroom. It is possible that a nurse made that suggestion to her. (Wexler Dep. 59:13-18; Long 18:5-10; Axelrod Dep. 18:12-14).

Response:

Objection, number 32 violates the Local Rule 56.1 because it is neither concise nor separate. Local Rule 56.1B.(1) makes clear that the numbered statement be separate and concise statement and this is neither separate or concise and is not a statement. Admitted that Dr. Wexler's instruction to pump in the bathroom did not come from Dr. Long. Admitted Dr. Wexler testifies she could not recall from whom the instruction came. Admitted the cite to Dr. Axelrod's testimony states:

" Q: Okay. Were you part of telling Dr. Wexler she was to pump in the bathroom?

A: No.

Q: Or you were not a part of -

A: I have no idea what that's about.

Q: Do you know that she was told?

A: I did not know that.

Otherwise denied; possibilities are not facts, they are issues to be resolved by a finder fact.

70. In January 2011 Dr. Wexler requested a different location to pump and Tara Douglas' office was provided as a pumping location and a lock was installed on the door to insure privacy. (Wexler Dep.34:10-25; Exhibit 11,Varnadore Affidavit ¶8).

Response:

Objection: Plaintiff's SMF 70 contains two (2) separate and distinct statements in violation of L.R.56.1.  Admit that Tara Douglas' office was provided as a pumping location and a lock was installed on the door to insure privacy.

71. Kennesaw Pediatrics filed a complaint in the Superior Court of DeKalb County on July 29, 2014 against Dr. Wexler, alleging, among other things, that she breached her employment contract for failing to return her signing bonus. (Exhibit 10, Long Declaration, ¶17).

Response:

Admitted.


72. The filing of the original complaint in the Superior Court Action (July 29, 2014) was not filed in retaliation against Dr. Wexler. (Exhibit 10, Long Declaration ¶17).

Response:

Objection. Violation of Local Rule 56.1B.(1) makes clear that," The court will not consider any act… (c) stated as an issue or legal conclusion." This statement of material fact is an issue or legal conclusion. Dr. Long's motives are in question and create an issue of fact for jury determination. Otherwise denied.


73. Kennesaw Pediatrics filed the original complaint in Superior Court (July 29, 2014) against Dr. Wexler to obtain a judgment against Dr. Wexler and to obtain damages and for no other reason.

Response:

Objection. Violation of Local Rule 56.1B.(1) makes clear that," The court will not consider any act… (c) stated as an issue or legal conclusion." This statement of material fact is an issue or legal conclusion. Further objection on the ground that motivation in filing lawsuit is not supported by any record citation, and cites to a pleading. This SMF is **denied** on the basis that Dr. Long's credibility is in issue in this case, and this SMF is an issue for a jury determination.


74. The September 28, 2015 amended complaint in the Superior Court action had nothing to do with Dr. Wexler's EEOC complaint and was not filed in retaliation. (Exhibit 10, Long Declaration ¶18).

Response:

Objection. Violation of Local Rule 56.1B.(1) makes clear that," The court will not consider any act… (c) stated as an issue or legal conclusion." This statement of material fact is an issue or legal conclusion,  Denied on the basis that Dr. Long's credibility is in issue in this case, and this SMF, citing to a self serving declaration, requires determination as to truth of the matter asserted by a jury .

75. Dr. Wexler filed an EEOC complaint on October 24, 2014 and identified May 15, 2014 as the earliest and latest date on which discrimination allegedly occurred. (Exhibit 5).

Response:

Denied that "Discrimination" occurred only on May 15, 2014. The form goes on to show that on May 1, 2014, Dr. Long inquired whether Plaintiff was still lactating. It also shows Plaintiff was subject to an adverse employment action on May 15 2014.

76. Wexler's EEOC complaint does not mention retaliation. (Exhibit 5).

Response:

Admit.

77. At the time this litigation was commenced Dr. Wexler was not then pumping, she was no longer working for Kennesaw Pediatrics and not an employee of Kennesaw Pediatrics. (Wexler Dep. 65:20- 66:5).

Response:

Admitted.

78. Dr. Long estimates that using Dr. Wexler's rate of compensation in her employment agreement, the cost to Kennesaw Pediatrics would have been the sums of about $336.58 (for two weeks). (Exhibit 10, Long Declaration ¶14; Exhibit 6).

Response:

 Objection: SMF 78 is vague, ambiguous, and unintelligible. Dr. Long's estimates and opinions are in dispute, and based upon Dr. Log's credibility for their veracity and accuracy. Resolution of credibility issues are the sole province of the jury.


79. Dr. Long estimates that, measuring this cost by reference to lost revenue, the cost would be not more than $1,080. (Exhibit 10, and Long Declaration ¶15).

Response:

Objection. SMF 79 is vague, ambiguous , and unintelligible. Plaintiff cannot respond to undefined 'cost'. Otherwise denied.


80. Dr. Long testifies that it is very expensive to recruit physicians, costing $10,000 to $30,000. (Exhibit 10, Exhibit 16; Long Dep 155:7-22).

Response:

Admitted

**Plaintiff's "me too" evidence is set forth below – defendant disputes the relevance of these facts but includes them because they are in the record and plaintiff might reference them. Defendant also disputes the accuracy and truthfulness of most of Dr. Levine's testimony.**

81. Dr. Levine was hired on September 1, 2010 under a part-time contract (1.5 days per week, plus a share of weekends and hospital rounds). (Levine's employment contract, Exhibit 14, produced in Defendant's Response to Interrogatory – Exhibit 68- Levine Contract).

Response:

Admitted

82. When she was hired, Dr. Long knew she would be pumping at work when she started. (Levine Dep. 15:10-19).

Response:

Admitted

83. She did pump at work when she started and was given pumping breaks.

(Levine Dep. 15:25 - 16:1)

Response:

Admitted.


84. She does not complain of being discriminated against on the basis of pumping

at work, like Dr. Wexler does, but she does complain that she did not notice a

camera in the office where she originally pumped. (Levine Dep. 16:2-5,

18:15-23, 19:2-18).

Response:

Objection. This SMF violates L.R. 56.1 as it asserts three (3) separate facts. Denied

that Dr. Levine does not complain of being discriminated against on the basis of

breast pumping. Dr. Levine states Dr. Long discriminated against her. (Levine

Dep. 18: 16-19:1.)

As to whether Dr. Long discriminates against breast pumping mothers at the job,

Dr Levine answers: "I can't really say. That wasn't my main issue. I don't

remember being-- the only issue was the-- as the accommodations made for that. I

was a quick pumper….It was just finding a place to do it because originally I was

pumping in my office". Levine Dep. 19: 2-11.

Describing the instances and forms of discrimination that occurred to her, Dr. Levine testifies:

A: It was pertaining to the same issue of increasing my contract hours, and it was when I was waiting -- it was -- I took my pediatric boards for the first time, and I was awaiting the results of that test, and he said to me -- one of the excuses that he gave as far as not increasing my hours is he doesn't even know if I passed my pediatric boards.

And I gave the example ....Sarah Yount I think is the doctor there, she was hired around the same time as me, failed her boards twice, hadn't even taken the boards again waiting for results, but she was a full time contracted physician.

And I said to him [meaning Dr. Long] "Well, how can you not want to give me a fulltime contract, because you don't know if I passed my boards yet, this is the first time I'm taking them, but you have a fulltime physician here who has failed her boards, like, twice,"

So. And that was the same conversation where I got tearful about that comment about my eggs drying up." Levine Dep. 21: 11 - 22:5.

Admitted Dr. Levine complained about a camera in the room used for breast pumping. Levine, with regard to pumping, further testifies:

Q: In any case, you didn't complain about the accommodations that you had?

A: No.

Q: Okay.

A: That's because I was embarrassed that someone had seen me pumping. (levine

Dep. 46: 12 - 17.)


85. She asked for additional hours and was given them, working essentially a full-

time schedule. (Levine Dep. 28:9-20)

Response:

Admit the citation supports SMF 85, but Deny any inference that Dr. Levine was

not discriminated against because of her condition as a pregnant, then lactating

female. Dr. Levine testifies:

A. No, I was asking for the contract to be changed where I was guaranteed a full-

time schedule so another physician wouldn't be hired and my hours decreased."

Levine Dep. 29: 10-13

"Q: I see. Is that -- it's because of that you believe Dr. Long treated you unfairly?

A: yes.

Q: Okay. And you mentioned that that conversation occurred in April of 2011

when you asked Dr. Long for a full - time -- to have your contract amended to

make it full - time, and it was at that time that --

A: I asked pretty frequently, you know. I don't remember the exact time frame. I just remember the conversation pertaining to being pregnant happened in April when I took out the AFLAC insurance. (Levine Dep 29: 14-25, 30:1).

Dr. Levine testifies further on this issue:

"A: I don't know the business reason. I know Dr. Long made it clear in April that he wasn't going to make me full time because I might get pregnant.

Q: Okay. Did he say -- what do you recall Dr. Long saying that led you to believe that?

A: He asked me if I was pregnant, he mentioned the insurance, he said, how do I know if you get pregnant that you'll be able to work all these hours. And I told that I would -- I needed to work full time because I needed the money, I needed to be full - time, I had student loans, he said "Well, the reason I hired you was because you have a rich lawyer husband," something to that effect, you're buying a house in Sandy Springs, so that's my understanding." (Levine Dep. 43:12 - 44:1).


86. In April 2011 she asked for a guaranteed full-time contract, which Dr. Long denied, although she continued to work a full-time schedule. (Levine 29:17-25, 30:17- 31:9)

Response.

Admit that Dr. Levine asked for a full time contract in April 2011, among other times. (Levine Dep 29: 17 -25). Admit that Dr. Long denied Dr. Levine's April 2011 request for a full - time contract. (Levine Dep 29: 17- 30: 1).

Admit Dr. Levine worked four or five days.


87. Dr. Levine believed that Dr. Long was discriminating against her by not granting her wish for a full-time guaranteed contract. (Levine Dep. 6:17 - 7:9, 21:7 - 22:3, 29:6-16, 40:3-22).

Response:

Admit SMF 87 reflects one of several ways Dr. Long discriminated against her. Additionally, Dr. Levine believed that Dr. Long discriminated against her due to the possibility she might become pregnant. (Levine Dep. 43:12 - 44:1).


88. She was worried her hours might be cut back and thought she was being treated unfairly when compared to another female doctor, Dr. Sarah Yount, who had a full-time contract. (Levine Dep. 7:3-9, 21:18-23)

Response:

Admit Dr. Levine was worried her hours might be cut back.

Admit Dr. Sarah Yount had a full - time contract. Admit Dr. Levine believed she was being discriminated against because Dr. Long believed she would become pregnant. (Levine Dep. 43:12 - 44).

89. Dr. Yount was hired under a full-time schedule but Dr. Levine was hired under part-time schedule. (Levine 34:8-17 and see also 5:25-6:2)

Response:

Object to SMF 89 which contains two (2) facts in violation of L.R. 56.1.

Otherwise, admit Dr Levine testified regarding Dr. Yount's employee status:

"Q:  Okay. Mentioned Dr. Yount in your testimony earlier. When Dr. Yount was hired, was she hired under a full - time schedule?

A: My understanding was that.

Q: Okay.

A: I never saw her schedule. Contract." (Levine Dep. 34: 8-13).

90. Dr. Levine received a job offer in December 2011 from another employer. (Levine Dep. 31:14-16)

Response:

Admit.

91. She accepted it and left Kennesaw Pediatrics in December 2011.

(Levine Dep. 5:2-4)

Response:

Admit.


92. Under her separation agreement, she paid $5,000 to be released from

her non-compete clause with Kennesaw Pediatrics. (Levine Dep 20:18-25; Levine

Separation Agreement is Exhibit 13 hereto; Exhibit 10, Long Declaration ¶8.

Response:

Deny deposition citation supports SMF 92. Financial terms of separation

agreement are redacted as cited.. Object to Long Declaration ¶ 8: Dr. Long's

credibility is in issue in this case, and the truth or falsity of SMF is a fact to be

determined by a jury. Otherwise, admit the citation supports SMF 92.


93. She was not fired or terminated by Kennesaw Pediatrics. (Levine 20:8

- 21:6)

Response:

Denied. Citation does not support SMF 93.

94. Kennesaw Pediatrics took no adverse employment action against Dr.

Levine. (Long Declaration ¶11)

Response:

Objection: Object to Long Declaration ¶ 11: Dr. Long's credibility is in issue in

this case, and the truth or falsity of SMF 94 is a fact to be determined by a jury.

Second objection: SMF 94 is stated as an issue or conclusion. Otherwise denied.


95. Dr. Levine alleges Dr. Long stated that she had a big house and a rich husband.

(Levine Dep. 9:15-22).

Response:

Admit citation supports that Dr. Levine testified that Dr. Long told her she was

hired because she had a rich lawyer husband and was buying a house in Sandy

Springs. Plaintiff denies any additional inferences or paraphrasing in Defendant's

SMF 95.


96. Kennesaw Pediatrics had a good business reason for keeping Dr.

Levine part-time: it allowed for greater scheduling flexibility. Dr. Levine admits

this. (Levine Dep. 41:7-13; Exhibit 10, Long Declaration ¶9).

Response:

Denied that Levine Dep citations supports SMF 96. Object to Long Declaration ¶9.

Dr. Long's credibility is in issue in this case, and the truth or falsity of SMF is a

fact to be determined by a jury. Second objection: SMF 96 is stated as an issue or

conclusion in violation of L.R. 56.1

97. Dr. Levine and Dr. Sarah Yount were both female. (Levine Dep.

21:19-20).

Response:

Admitted.

98. Dr. Levine also testified that, while working at Kennesaw Pediatrics

from September 2010 to December 15, 2011, she and Dr. Long and others

interviewed Dr. Laura Verigan for a job at Kennesaw Pediatrics. (Levine Dep.

49:10-17). Defendant disputes this, see below.

Response:

Admit citation reflects Dr. Levine's testimony in deposition. See also Declaration

of Dr. Levine ¶'s 2,3,4 and 5. Dr. Levine indicates that since her deposition, she

was informed Dr. Verigan testified that she  did not interview with  Dr. Long

during Dr. Levine's employment with him. Dr. Levine goes on to state that she

worked with Dr. Verigan at a different medical practice after her employment with

Dr. Long ended. She may have learned from Dr. Verigan that she had undergone

IVF during a discussion Dr. Levine had with Dr. Verigan at that time. Dr. Levine

continues "Because of this, it is possible that I mistakenly recalled that the person

who interviewed with Dr. Long who had undergone IVF and was having twins was

Dr. Verigan". (Levine Declaration ¶4.)  Dr. Levine goes on:

"In any event, I am confident in my recollection that Dr. Long made this comment

["he mentioned she was either undergoing IVF or did undergo IVF and was having

twins, and he didn't want any part of that" (Levine Declaration ¶ 2)] about a

candidate, although I cannot say with certainty which candidate it was about."

(Levine Declaration ¶5).


99. Dr. Levine implied that Dr. Long did not offer Dr. Verigan a job on the basis

that she was pregnant and having twins from a complicated IVF pregnancy.

(Levine Dep. 49:14-24).

Response:

Object L.R. 56.1 : SMF 99 is neither concise nor limited to a single fact.

Second Objection: object to word:  "implied".

Third objection: SMF 99 is a conclusion prohibited by L.R. 56.1

Deny that Dr. Levine implied anything. Admit that Dr. Levine testified that the

Doctor being interviewed was either undergoing or had undergone IVF.

Admit that Dr. Levine testified that Dr. Long told Dr. Levine that the candidate

was having twins. Admit that Dr. Levine testified that Dr. Long told Dr. Levine he

"didn't want any part of that".


100. However, Dr. Verigan testified that she had her twins from an IVF procedure

in 2008, that she interviewed with Dr. Long in early 2009, that although

Dr. Long did not initially offer her a job, he did offer her a part-time job later in

2009, which she declined. (Verigan Dep. 11:4-18, 6:12-17, 7:14-24)

Response:

Object: SMF 100 contains multiple facts. Otherwise admitted.


101. Dr. Verigan presented her resume to Kennesaw Pediatrics in February

2009. (Verigan Dep. 13:10 – 14:6, Exhibit 2 to Verigan's Dep.)

Response:

Admitted.

102. Dr. Verigan also testifies that she interviewed Dr. Brugner in 2009.

 (Verigan Dep. 6:18-22).

Response:

Admitted.


103. Dr. Verigan testified that she did not again interview with Kennesaw

Pediatrics and that she never interviewed with Dr. Levine. (Verigan Dep. 6:23-25,

8:12-15; also Verigan Dep. 6:18-22).

Response:

Admitted.


104. After Dr. Levine left Kennesaw Pediatrics, Dr. Levine worked with

Dr. Verigan starting around 2012. (Verigan Dep.19:15 - 20:3).

Response:

Admitted.


105. Dr. Verigan testifies that she probably discussed her twins and IVF

pregnancy with Dr. Levine during that time. (Verigan Dep. 12:8-10, 19:15 -

20:3).

Response:

Admitted

106. Dr. Verigan did not interview with Kennesaw Pediatrics while Dr.

Levine was employed. (Exhibit 10, Long Declaration ¶2; Exhibit 3, Brugner

Declaration, ¶3 - 5).

Response:

Admitted.

107. In January 23, 2017, Dr. Levine's counsel delivered to defendant's

counsel declaration dated January 18, 2017. (Exhibit 15).

Response:

Admit defendant's counsel received Dr. Levine's declaration dated January 18th

2017 which is Exhibit 15 to Defendant's MSJ.

108. In this declaration, Dr. Levine admits that possibly it was not Dr. Verigan that

Dr. Long was referring to and admits that she worked with Dr. Verigan at a

different medical practice, and may have learned about Dr. Verigan's IVF

procedure and twins. (Exhibit 15, ¶¶3 & 4).

Response:

Admit.

109. Dr. Levine goes on to cast doubt about whether Dr. Long had actually interviewed Dr. Verigan and provides no details about when the person Dr. Long allegedly referred to actually interviewed at Kennesaw Pediatrics. (Exhibit 15, ¶¶3-5).

Response:

Objection: SMF 109 states only conclusions, both factual and legal, in violation of L.R. 56.1. Otherwise denied as this citation does not support SMF 109.

110. Dr. Levine also testifies about her "memory" but not what actually happened or who she allegedly interviewed with Dr. Long. (Exhibit 15, ¶5).

Response:

Objection: SMF 110 states only conclusions, both factual and legal, in violation of L.R. 56.1, and is vague, ambiguous, and is a negative statement of fact. Otherwise admit that Exhibit 15, ¶5 (Declaration of Dr. Amy Levine) states:

"In any event, I am confident in my recollection made this comment about a candidate, although I cannot say with certainty which candidate it was about."

111. Dr. Long testifies that he has no knowledge of any other woman whom he interviewed who had IVF and twins during the time Dr. Levine was employed with Kennesaw Pediatrics P.C. (Exhibit 10, Long Declaration ¶3).

Response:

Admit

112. Dr. Brugner testifies that the only person she interviewed, ever, who discussed having twins through an IVF procedure was Dr. Verigan, who interviewed in 2009, before Dr. Levine started. During the time Dr. Levine worked for Kennesaw Pediatrics, Dr. Brugner interviewed all the candidates who came in for an interview. (Exhibit 10, Long Declaration ¶4; Exhibit 3, Brugner Declaration ¶5). She testified that to the best of her knowledge no one interviewed at Kennesaw Pediatrics while Dr. Levine was working who had, or was having twins though an IVF procedure. (Exhibit 3, Brugner Declaration ¶3 – 6; Exhibit 10, Long Declaration ¶4).

Response:

Objection: This statement contains multiple facts which are neither separate nor concise in violation of L.R. 56.1; otherwise admit.

Respectfully submitted this 3rd day of March 2017,

The Law Offices of Shimshon Wexler, PC

 s/ Shimshon Wexler (GA Bar No 436163)
315 W Ponce de Leon Ave., Ste. 250
Decatur, Georgia 30030
Tel: 212-760-2400
Fax: 917-512-6132
swexleresq@gmail.com